Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# OPINION

No. 04-06-00417-CV

Sylvia **CASAS**, Robert Gundling, and Substantively Consolidated Bankruptcy Estates of
Fountain View, Inc., as Successor to Summit Care Corp. and Summit Care Texas, L.P. d/b/a
Comanche Trail Nursing Center,
Appellants

v.

Rosamarie **PARADEZ**, as the Administrator and Heir at Law of the Estate of
Tranquilino Mendoza, Deceased,
Appellee

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 99-CI-17411
Honorable Andy Mireles, Judge Presiding

## ON APPELLEE'S MOTION FOR REHEARING

Opinion by:   Karen Angelini, Justice

Sitting:   Catherine Stone, Justice
Karen Angelini, Justice
Steven C. Hilbig, Justice

Delivered and Filed:   June 25, 2008

APPELLEE'S MOTION FOR REHEARING GRANTED; AFFIRMED

On September 5, 2007, we issued an opinion affirming the judgment in part and reversing

it in part. *See Casas v. Paradez*, No. 04-06-00417-CV, 2007 WL 2479602 (Tex. App.—San Antonio

Sept. 5, 2007). Appellee Rosamarie Paradez then filed a motion for rehearing, and after reviewing

it, we requested a response. After considering the motion for rehearing and responses filed, we grant appellee's motion for rehearing and withdraw our prior opinion and judgment, and substitute this opinion and judgment in their place.

This appeal involves a medical malpractice survival action brought by the decedent's daughter, Appellee Rosamarie Paradez. The decedent, Tranquilino Mendoza, was eighty-one years old and residing in the Comanche Trail Nursing Center in Big Spring, Texas, when he was injured by his roommate. On appeal, all three appellants, Sylvia Casas, Robert Gundling, and Substantively Consolidated Bankruptcy Estates of Fountain View, Inc., as Successor to Summit Care Corporation and Summit Care Texas, L.P. d/b/a Comanche Trail Nursing Center ("the Summit Care Appellants"), argue the following: (1) the trial court erred in denying their respective motions for new trial because "the record contains improper and incurable jury argument"; (2) there is factually insufficient evidence to support the jury's findings with respect to physical pain and mental anguish and with respect to physical impairment; (3) "a new trial is warranted because the jury's damages awards are so excessive and egregious as to suggest that the jury's finding resulted from passion or prejudice"; and (4) the trial court erroneously awarded judgment against Summit Care Corp., Summit Care Texas, L.P., Sylvia Casas, and Robert Gundling "in an amount exceeding the total of one compensatory damages cap, pursuant to former article 4590i, section 11.02." The Summit Care Appellants also argue that (1) the trial court erroneously failed to give full faith and credit to a bankruptcy court's order precluding Paradez from duplicative claims, and (2) the trial court should have found Summit Care Corp. to be a healthcare provider and applied the damages cap under former article 4590i, section 11.02. Gundling also argues that there is legally and factually insufficient evidence to support the jury's finding of his negligence. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Before September 1, 1997, Comanche Trail Nursing Center was operated by Summit Care Corp., a publicly held corporation based in California that operated twenty nursing homes in Texas. After September 1, 1997, Comanche Trail was operated by Summit Care Texas, L.P., and Summit Care Corp.'s license as a "health care provider" was transferred from Summit Care Corp. to Summit Care Texas, L.P.[1] Appellant Sylvia Casas was the administrator of Comanche Trail. Appellant Robert Gundling was a regional vice-president, employed by Summit Care Corp. Gundling, based in San Antonio, was responsible for enforcing the financial policies issued by Summit Care Corp.

In January 1996, the CEO and Chairman of Summit Care Corp., Bill Scott, created an aggressive marketing and sales program to increase company revenues. The program's objective was to add 212 new residents to company rolls, raising the occupancy rate in its Texas nursing homes to 95% capacity. According to Scott, the addition of 212 new residents at an average rate of $65 per day would substantially increase revenues. In accomplishing this goal, Scott replaced managers and administrators with people who were more marketing oriented; he created specific sales programs and monthly census goals at each home; he required the senior vice-president of marketing and the Texas regional marketing director to make daily calls to each nursing home to ensure the new sales programs were being followed; and he held a weekly conference call with all marketing personnel to discuss the progress of each nursing home and compare the actual census to the goals set for each home.

---

[1]About three months before a trial setting, both Summit Care Texas, L.P., and Summit Care Corp. filed for bankruptcy in California and sought to reorganize under Chapter 11. The bankruptcy court then confirmed a plan of reorganization, which provided for the substantive consolidation of all debts and assets of Summit Care Texas, L.P., and Summit Care Corp. Paradez's case was then allowed to proceed to trial.

Comanche Trail was one of the nursing homes noted by Scott to have an unacceptable census level. Thus, Comanche Trail needed to increase its average census from 82 to 112 residents and convert 28 skilled nursing beds into Alzheimer's beds. To accomplish these goals, it recruited patients from the Veteran's Administration ("V.A.") Hospital and the Big Spring State Mental Hospital. The V.A. was seen as a "source" for patients and was a primary marketing target. Thus, Comanche Trail began marketing itself as having an Alzheimer's unit when, in fact, it was never licensed as a certified Alzheimer's unit as required by state law.

Robert Gundling was selected to oversee Texas operations and monitor the progress of Scott's business plan. Gundling's efforts, however, were criticized by Scott who informed Gundling that he needed to be "more aggressive dealing with census issues, like Big Spring [Comanche Trail]" and to get "tougher" "about census development in several facilities." Indeed, Gundling admitted at trial, "It was all of our jobs to keep the number of beds filled, yes. That's – that's what the business was." Thus, Gundling began to push Sylvia Casas, the Comanche Trail administrator, to increase her census. He required Casas to provide him with a daily census report, to report all resident discharges from Comanche Trail, and to state the reason for such discharge.

The Director of Nursing at Comanche Trail, Carol Swafford, however, repeatedly warned Casas that the "Alzheimer's wing" was in a state of crisis due to insufficient and inadequately trained staff. And Swafford complained the admission of psychiatric patients to the "Alzheimer's" unit "was not appropriate; it was not a good mix" because "[w]e weren't a psychiatric unit."

It was in this environment that on July 8, 1997, Comanche Trail recruited Geronimo Vela, a mentally incompetent veteran who had been involuntarily committed to the psychiatric unit at the V.A. hospital pursuant to an emergency detention order. Before Vela's admission, the staff at Comanche Trail "knew that he had a history of violent behavior with family members and staff at

the V.A." Thus, when he arrived at Comanche Trail, he was admitted to the nursing home's secured unit "[b]ecause of his history of behavior problems and the possibility that he could wander."

From the moment Vela arrived at Comanche Trail he was physically violent. In his first eighty-two days, he had over thirty episodes of violence, sending four residents to the hospital. Swafford testified Vela was physically violent or attacked other residents "more times than [she] [could] count."

Casas was aware of Vela's escalating violence. During daily meetings with Swafford, the Assistant Director of Nursing, and a Comanche Trail social worker, she was informed that Vela was a grave risk, was warned he was violent and aggressive "almost on a daily basis," and was warned his violence was "escalating." Yet, no one at Comanche Trail informed any of the residents' families or Vela's doctor about most of Vela's attacks. Nor was Vela's care plan revised in light of his violent behavior. Comanche Trail even failed to report most of Vela's violent attacks to the State as required by law.

As Vela's violent behavior increased, the nursing department asked Casas to discharge Vela from the nursing home. Casas, however, refused, responding that she was concerned the census was down. Indeed, Casas's concern regarding how her superiors would respond to the low census was valid. Two months after Vela was finally removed from the nursing home, Casas was criticized by Gundling and Summit Care Corp. for discharging residents to competitors.

On September 26, 1997, the eighty-first day of Vela's residence at Comanche Trail, Vela was moved, in violation of doctor's orders, from the locked wing of the nursing home to the room of eighty-one year-old Tranquilino Mendoza. Mendoza's room was the room located farthest from the nurses' station. On September 28, 1997, Mendoza, who had been out of the nursing home for the weekend, returned to his room. Soon after he returned, Manuela Bernal, a nurse's aide, heard raised

voices coming from Mendoza and Vela's room. According to Bernal, Vela sounded aggressive, and she reported her concern to the charge nurse. Within half an hour of Bernal's warning to the nurse, Vela picked up a double-insulated water pitcher full of water and began beating Mendoza. Under the stress of the repeated blows to Mendoza's face and head, the pitcher shattered into jagged pieces of plastic. The pitcher lay in pieces on the floor covered with Mendoza's blood. Mendoza was transported to the hospital by ambulance.

On December 10, 1999, Mendoza filed this lawsuit. A year later, he died of pneumonia, and his daughter and the administrator of his estate, Rosamarie Paradez, substituted in as the main party. At trial, Paradez presented evidence that as a result of the attack Mendoza suffered from a severe concussion and brain damage. Paradez testified her father was never the same after the attack. In contrast, appellants argue that there is factually insufficient evidence to support the damages awarded and that the evidence showed Mendoza did not suffer any permanent damage and recovered quickly.

Before trial, appellants had consistently contested liability. However, at trial, when Paradez called Bill Scott, Chairman of the Board for Summit Care, as her second witness, she asked Scott to clarify whether the Summit Care entities (whom he was representing) were contesting liability. Scott admitted liability for Mendoza's injuries. When Gundling and Cases were asked about liability, they also spoke of accepting responsibility. Thus, at the jury charge conference, the Summit Care entities and Casas stipulated to liability. Gundling did not, and so the first question of the charge asked the jury whether Gundling's negligence proximately caused Mendoza's injuries, a question the jury answered in the affirmative. The jury also found Summit Care Corp. to be 35% responsible; Summit Care Texas, L.P., to be 35% responsible; Casas to be 25% responsible; and Gundling to be 5% responsible. With regard to damages, the jury found $3 million in physical pain and mental anguish; $50,000 in disfigurement; and $7 million in physical impairment. The jury also found both

Summit Care entities had acted with malice and assessed $50 million against Summit Care Corp. and $100 million against Summit Care Texas, L.P., in exemplary damages.

In entering judgment, the trial court applied the statutory damages caps pursuant to former article 4590i, and signed a judgment awarding over $10 million.

## INCURABLE JURY ARGUMENT

*A.     Background*

Counsel for both Summit Care entities began closing argument by stating that the defendants had accepted responsibility for the past nine years. Thus, counsel claimed, "The dispute in this case is what it has always been, and that is: A difference in what is fair and reasonable compensation for Mr. Mendoza." Counsel then blamed Swafford, who had given devastating testimony against the defendants:

> We were ready from the first day to accept responsibility, but we had Ms. Swafford who wouldn't and is coming around behind Ms. Casas and saying, "Oh, you lied. You hid things from the State." It's not Ms. Casas that was our problem. I mean, there are issues with Ms. Casas, and she admitted responsibility. You heard her talk about that. But Ms. Swafford was part of our problem.

According to counsel, "The nursing home, Comanche Trail, accepts responsibility, and they always have." And, in response to Paradez's allegations of a cover-up, counsel argued that although the defendants "didn't do what they were supposed to do," they "weren't trying to hide it." In closing, he promised the jury members that the defendants would abide by their verdict:

> You'll have the records. Look at it all. And look at the photographs. You'll see them — and I'm going to let [co-counsel] talk more about this. You'll see the injuries resolved over time. The dispute on that is the emotional injuries, you know? You all use your common sense. And I think that, you know, when you do, whatever you tell us, we're going to abide by it, okay? I mean, there are — there are issues of appeals and stuff like that. But, I mean, you all are — we're here to get you all to help us with this.

Co-counsel for the Summit Care entities then, during her closing argument, asked the jury members to take their emotion out of the case and argued Mendoza recovered quickly and was the same after the attack. She requested that instead of awarding Paradez $15 million as argued by Paradez's counsel, fair and reasonable compensation would be "something in the range of $300,000." She then asked the jury to consider "logical questions":

> Ladies and gentlemen, as you answer these questions that the Judge has charged you to answer, you need to answer some logical questions. Let's put the first one up. You want to go on to the next one? Thank you. These are some logical questions that you are going to have to bring your common sense to the table to answer. Why wouldn't the family share their concerns if, in fact, they were seeing the changes that they described to you today. Why wouldn't they do that? This is a family that did share personal information when it was appropriate. They shared personal information about their father when it was medically necessary. We saw the notes about why he was admitted in Parkland in 1995 and when he went back to Deerings in February of 1999. Why wouldn't the family share their concerns with some of those health care providers? Let's go on to the next one. Where is Ray? We didn't hear from Ray Mendoza in this case. Mr. Mendoza lived with Ray for a year and four months, from August of 1999 all the way up until December of 2000. We didn't hear from Ray. Let's go on to the next one. Where is the only medically-trained professional who saw Mr. Mendoza between August 13 of 1999 and December 20 of 2000, before he got to the hospital? Where is she? That's Dr. Martin-Canicci. Why wasn't she here? Where is she? If she really thought that there were serious problems with Mr. Mendoza when she interviewed him in June of 2000, why didn't she come here and tell you about that? And why didn't she get some treatment for Mr. Mendoza in June of 2000, before his death in December?

Thus, on rebuttal, Paradez's counsel began by responding to defense counsels' arguments:

> I had a bunch of things that I wanted to say to you that I wrote out last night, and they all changed. They changed because of what was just said to you by these lawyers for these people. And they changed because I have never—I never believed, when we started this case, that their conduct before Mr. Mendoza was severely and brutally beaten could be matched. They outdid themselves. Tranquilino Mendoza wasn't a rich man. He wasn't a powerful man. He wasn't an educated man. But he mattered. He mattered. Mr. Gundling, he mattered. Ms. Casas, he mattered. Mr. Scott, he mattered. The truth—I'll tell you something that doesn't matter to them. Not only does Mr. Mendoza not matter, the truth doesn't matter. I want you to ask yourself who has been straight with you here, and I want to talk about that. Mr. Baine stood here before you and — Pull up that first quote. "We were ready—" And he told you— this happened 15 minutes ago. "We were ready, from the first day, to accept

responsibility." January the 30th, 2006: Defendants enter a general denial of the allegations. They deny everything. Everything. January the 10th, 2006: "Although Defendant denies liability. . ." "We were ready to accept responsibility from day one." I thought this was about just damages. You remember when I talked to you guys in voir dire? There [were] 50 of you then, there [are] 13 of you now. And, at that time, I said, "You folks can change the way these people do business." And, I'm going to talk to you about that, because you can. The next thing was this—Pull up slide number 7. Let's talk about their acceptance of responsibility. Ms. Casas—Document number 2 is the survey that they agreed was true. "No, sir we appealed it." Question: "You dispute it." And then—And that bespeaks their conduct. Because what they want to do is continue the plan. The plan hasn't stopped. You remember what the plan was. The plan was not what [opposing counsel] tried to turn it into, the budget. Because I got them to testify—Mr. Gundling to testify that the budget was the necessary money to provide good, safe patient care. The plan was to bust the budget. And how were they going to bust the budget, the month they needed for good, safe patient care? Pull up Exhibit 94, please. They were going to go start recruiting psychiatric patients and put them in a locked unit where they had . . . where they had no psychiatric training. The people that were in that ward had no psychiatric training, they staffed it with half a nurse and a social worker. . . .

Paradez's counsel then went through in detail how, despite Summit Care's claims that they would never cut labor and food, all care to patients decreased under the plan, from RNs to LVNs, CNAs, meals, salaries, and supplies. But, operating income increased from $16.44 per day to $19 per day.

Paradez's counsel then pointed to other inconsistencies:

Now, then [opposing counsel] comes to you and tells you, "Whatever you tell us, we're going to abide by it. Whatever you tell us, we're going to abide by it." Who's being honest with you? You know what he said after that? You know what he said after that? Put it up there. "Of course, there are issues [of] appeals." They don't get it. They don't get it. Somebody asked a question during voir dire. The question was: "Can we make a difference? Does this really help? When we award punitive damages against people like this, does it really help?" Tranquilino Mendoza was not a powerful man. He was a frail, helpless and vulnerable man. And there are thousands of Tranquilino Mendozas out there right now waiting for your verdict. There are thousands of them right now, in the care of these people, waiting for your verdict. In order for those people to hear your verdict, Mr. Scott must hear your verdict. Mr. Scott must hear your verdict. Ms. Casas must hear your verdict. Summit Care must hear your verdict. Who's being straight with you? Who's telling you the truth? I have to say that I found this offensive: "Where is Ray?" Rosie testified that Ray was very sick, and he is. So, we brought other family members to this courtroom. And there is a legal proceeding, a rule that they have a right to do — and they do have a right to do it— and that rule is called "invoking the rule." And that rule allows them to

keep the family members out of the courtroom, and they invoked it. And we had to take the family members out of the courtroom.

Baine: This is improper argument.

Court: Overruled.

And then they tell you, "Where is Ray?" How dare they? The deceit and the denial that has gone on for ten years with this family continues today with this Jury, with you.[2]

Appellants claim that, in his rebuttal, Paradez's counsel committed incurable jury argument because he accused appellants' "trial counsel of lying and questioned their integrity." Appellants also claim Paradez's counsel's "argument, in which he attacked the truthfulness of Defendants and their counsel, was tantamount to calling them liars." According to appellants, Paradez's counsel "misrepresented the facts and the legal impact of invoking the witness sequestration rule to further the argument that Defendants and their attorneys were liars."

In response, Paradez argues the argument was not improper because "[i]t grew out of the evidence and the earlier arguments"; "[i]t reinforced [Paradez's counsel's] argument that the jury needed to judge credibility, and it rebutted the less than credible arguments advanced by appellants." According to Paradez, her trial counsel's argument did not attack a lawyer, but instead attacked a legal position.

B.    Standard

Texas Rule of Civil Procedure 269(e) provides that trial counsel must confine his argument "strictly to the evidence and to the arguments of opposing counsel." TEX. R. CIV. P. 269(e). And, generally, to obtain reversal on the basis of improper jury argument, an appellant must prove "(1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate,

_____

[2]There was no objection by opposing counsel after this comment.

such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge." *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979); *see also Living Ctrs. of Tex., Inc. v. Peñalver*, No. 06-0929, 2008 WL 204502, at *2 (Tex. Jan. 25, 2008). However, when retraction of the argument or instruction from the court cannot cure any probable harm, the argument is said to be "incurable" and complaint about the argument may be made even though objection was not timely made. *Peñalver*, 2008 WL 204502, at *2. Such incurable argument, however, is rare. *Id.* at *3.

To prevail on a claim that improper argument was incurable, the complaining party must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effect. *Id.* at *2. In considering whether the complaining party has met this burden, we determine the amount of harm from the argument by considering the following:

> whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict.

*Id.* (quoting *Tex. Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 858 (1954)).

C.    *Discussion*

Recently, in discussing incurable argument, the Texas Supreme Court explained,

> [J]ury argument that strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system. Such analysis is not subject to the general harmless error analysis.

*Peñalver*, 2008 WL 204502, at *2. Here, appellants argue that Paradez's trial counsel's comments were incurable because they attacked the integrity of the defense attorneys. However, as noted by the supreme court, "[n]ot all personally critical comments concerning opposing counsel are

incurable." *Id.* at \*3. Instead, to be incurable, the argument must "strike at the courts' impartiality, equality, and fairness" to the extent that they "inflict damage beyond the parties and the individual case under consideration if not corrected." *Id.* "Such arguments damage the judicial system itself by impairing the confidence which our citizens have in the system." *Id.*

Some courts have, under certain circumstances, held unwarranted attacks on the integrity of opposing counsel to be incurable. *See Amelia's Auto., Inc. v. Rodriguez*, 921 S.W.2d 767, 773-74 (Tex. App.—San Antonio 1996, no writ); *Circle Y v. Blevins*, 826 S.W.2d 753, 759 (Tex. App.—Texarkana 1992, writ denied), *abrogated on other grounds by State Farm Fire & Cas. Co. v. Morua*, 979 S.W.2d 616 (Tex. 1998); *Cross v. Houston Belt & Terminal Ry. Co.*, 351 S.W.2d 84, 86 (Tex. Civ. App.—Houston 1961, writ ref'd n.r.e.).

For example, asking a party whether he knew his lawyer was a convicted felon and had been disbarred for five years for filing a frivolous lawsuit was held to be incurable. *Amelia's Auto.*, 921 S.W.2d at 772. Even if the comments were provoked, this Court reasoned that the comments "clearly constitute an uncalled for attack on the character of appellant's counsel," which "had absolutely no relevance to the case being tried." *Id.* at 773. According to this Court, the "accusations made in this case strike at the heart of an attorney's credibility, and by association, the attorney's client." *Id.* at 774. And, because the accusations by their nature encompassed fraud and because "[f]raud is an integral component of a DTPA action, against which appellant was attempting to defend himself," "[t]he possibility that the [jurors'] feelings regarding appellant's attorney colored their view of the case is impossible to overcome." *Id.* Thus, counsel's comments were held to constitute incurable error. *Id.*

Similarly, accusing opposing counsel of manufacturing evidence and discussing an exhibit that had not been introduced in evidence when, in fact, the exhibit had been admitted and then urging

the jury to punish opposing counsel's client for his counsel's alleged misconduct has been held to be incurable. *See Circle Y*, 826 S.W.2d at 757-59.[3] In holding the argument was incurable, the Texarkana Court of Appeals explained that the comments by counsel "clearly charged defense counsel with manufacturing evidence" and that there can hardly be an accusation of more severity and seriousness than the charge that opposing counsel participated in a plot to manufacture testimony. *Id.* at 758-59. Further, the court explained the comments "were aggravated by the fact that the matters referenced to by defense counsel *were in evidence*." *Id.* at 759 (emphasis in original). And, the court emphasized "plaintiff's counsel continued the argument, insisting that defense counsel's fraudulent acts were done with full knowledge and approval of Circle Y, and urging that the jury 'punish' Circle Y for those actions." *Id.* Thus, the court held the argument was "improper, inflammatory, and incurable." *Id.*; *see also Cross*, 351 S.W.2d at 86 (holding that argument was improper and incurable where there was no evidence in record to support counsel's argument that opposing counsel had financial interest in case, went shopping for doctors, and manufactured evidence).

---

[3]Specifically, counsel made the following comments about opposing counsel:

> I don't know where he got this, and anybody with a typewriter can do it, but you look at where he said it come [sic] from, out of Dr. McGinty's record . . . . You look in those records. That ain't nowhere in there. . . . I didn't talk to y'all a while ago about punishing Circle Y of Yoakum, but I'm fixing to now. Remember that? A while ago I didn't say anything about punishment, but I think now they ought to be punished, because [defense counsel] didn't do that without the approval of his client. I can tell you that. . . . A badge of how desperate Circle Y of Yoakum is, is the actions of their lawyer in the closing argument, and that's why he didn't want your decision based on the actions of the lawyers. But remember, the lawyer is the agent for the client and does what he does as the agent for the client and with the approval of the client, and so I think you can take it into account. And they didn't do it to you once; they did it to you twice.

*Circle Y*, 826 S.W.2d at 757-58.

However, attacks against opposing counsel have also been held not to be error when the evidence in the record supports such attacks. Thus, in *Standard Fire Insurance Co. v. Reese*, 584 S.W.2d 835, 836-37 (Tex. 1979), the supreme court held defense counsel's comments that plaintiff's counsel, his client, and his client's doctors had engaged in a scheme to increase plaintiff's medical expenses were not improper because there "was direct evidence, as well as inferences from the evidence, which supported the argument."

Further, attacking the integrity of opposing counsel has been held to be harmless error under certain circumstances. For example, in *Beavers v. Northrop Worldwide Aircraft Services, Inc.*, 821 S.W.2d 669, 680 (Tex. App.—Amarillo 1991, writ denied), appellants argued that during closing argument opposing counsel improperly argued appellants' counsel had misrepresented facts to the jury in what counsel referred to as "the lawsuit world":

> In this world, it's a world sometimes of twisting, turning, exaggerating, repeating over and over, misstatement of facts, until the hope is that some people of twelve will accept those as true facts.

*Id.* Because the record contained no basis to support the allegation that appellants' counsel had misrepresented facts to the jury, the court held the argument was improper. *Id.* However, the court also found the argument not to be incurable error. *Id.* While the court did not approve of this type of argument, its examination of the record as a whole convinced it that the argument "was not of such an extreme nature as to reflect the greater probability that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that which he would have agreed but for the argument." *Id.*

Here, in rebutting an argument by defense counsel that Paradez should have called Ray Mendoza to testify because he lived with Tranquilino Mendoza for a period of time, counsel for Paradez argued that because Ray Mendoza was "very sick," Paradez "brought other family members

to this courtroom." Counsel then implied Ray Mendoza was unable to testify because defense counsel had "invoked the rule." We note some of the comments by Paradez's counsel were technically correct. There is a rule that the defendants had a right to invoke and that rule allows them "to keep the family members out of the courtroom." *See* TEX. R. EVID. 614. That rule was invoked by the defendants,[4] and after it was invoked, Ray Mendoza, had he been present, would have been unable to be present in the courtroom during the trial. However, invoking the rule did not prevent Ray Mendoza from being called to testify as a witness, and read in context, counsel's statements could be interpreted as making such an implication. Thus, the statements were improper.

However, counsel's statements regarding Ray Mendoza were not incurable; in light of the entire record, they were not "so inflammatory as to strike at the heart of the adversarial process or appeal to fundamental prejudices." *Macias v. Ramos*, 917 S.W.2d 371, 375 (Tex. App.—San Antonio 1996, no writ); *see Peñalver*, 2008 WL 204502, at *3 (explaining that incurable argument must "strike at the courts' impartiality, equality, and fairness" to the extent that they "inflict damage beyond the parties and the individual case under consideration if not corrected"). We do not find that the comments damaged "the judicial system itself by impairing the confidence which our citizens have in the system." *Peñalver*, 2008 WL 204502, at *3. Unlike the cases noted above that found incurable argument, here, counsel did not attack opposing counsel with accusations that had no relevance to the underlying case, *see Amelia's Auto.*, 921 S.W.2d at 773, nor did counsel improperly accuse opposing counsel of manufacturing evidence, *see Circle Y*, 826 S.W.2d at 757-59. Instead, read in context, counsel's statements could be interpreted as misinforming the jury about the law;

---

[4]Indeed, all parties invoked the rule at trial.

but, counsel's statements were, at best, ambiguous.[5] The statements concerning Ray Mendoza were not such a direct attack on the integrity of opposing counsel as to amount to incurable argument. Therefore, we hold that Paradez's counsel's statements, though improper, were not incurable.

However, because the above statements concerning Ray Mendoza and the appellants' invocation of the rule were improper, we must determine if they were harmful. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). Improper argument is harmful when "the argument by its nature, degree and extent constituted reversibly harmful error"; that is, when "the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Id.* at 839-40. In making this determination, we consider the length of the argument, whether it was repeated or abandoned, and whether there was cumulative error. *Id.* at 840. We must also examine all the evidence to determine the argument's probable effect on a material finding. *Id.* And, finally, we must evaluate the argument in light of the entire case, beginning with voir dire and ending with closing argument. *Id.*

We first note that the argument was brief and was not repeated. *See id*. And, in reviewing the record, we fail to see how these brief statements by counsel would have persuaded a juror of ordinary intelligence to reach a verdict contrary to that which he would have reached but for the argument. *See Manon v. Solis*, 142 S.W.3d 380, 392 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). The jury heard from many witnesses about the excessiveness and severity of Tranquilino Mendoza's damages and reviewed many exhibits containing his medical records. We cannot say the probability that Paradez's counsel's brief statements about Ray Mendoza and the invocation of the rule caused

---

[5]Paradez argues that the point of the "Where is Ray?" argument was to remind the jury about Rosamarie Paradez's testimony in which she explained why Ray Mendoza had not attended the trial.

harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. *See Reese*, 584 S.W.2d at 839-40. Therefore, we hold that any error was harmless.

Appellants also complain that Paradez's counsel's statement about the "deceit and the denial that has gone on for ten years with this family continues today" was incurable argument.[6] We disagree. This comment was supported by the evidence. There was evidence of Casas failing to report some of Vela's violent attacks to the State as required by law, of concealing the defendants' conduct from family members and physicians, and of nurses' notes disappearing. Also, Paradez's counsel's statements about defendants misrepresenting that they had accepted responsibility from the beginning is supported by evidence in the record. Thus, this statement was not incurable argument.

### SUFFICIENCY OF DAMAGES

According to appellants, the evidence is factually insufficient to support damages for physical pain and mental anguish and physical impairment. We disagree.

In reviewing the factual sufficiency of the evidence, we consider, weigh, and examine all the evidence presented at trial, including any evidence contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). And, we set aside a finding for factual insufficiency if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Finally, we employ the same standard of review for an excessive damages complaint as for any factual sufficiency of the evidence complaint. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998).

---

[6]Because opposing counsel did not object to these comments, we need only reach the issue of whether the comments were incurable. *See Reese*, 584 S.W.2d at 841 (explaining that a complaint about improper, but curable, jury argument is waived by the failure to object at trial).

The mere fact of a large award does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence. *See Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 228 (Tex. App.—Amarillo 2003, no pet.). Instead, the award must be flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience. *See Cresthaven*, 134 S.W.3d at 228; *Transit Mgmt. Co. v. Sanchez*, 886 S.W.2d 823, 826 (Tex. App.—San Antonio 1994, no writ). And, we may not order a remittitur unless the evidence supporting damages is factually insufficient. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 851 (Tex. 2000).

*A.   Pain and Mental Anguish*

There are no objective guidelines available by which we may measure the monetary equivalent of pain and suffering resulting from physical injury; thus, the jury is given broad discretion in awarding amounts appropriate for such damages. *Southwest Tex. Coors, Inc. v. Morales*, 948 S.W.2d 948, 951-52 (Tex. App.—San Antonio 1997, no writ). However, while juries must be afforded discretion in arriving at the determination of a figure for which there is no exact evaluation, there must be some evidence to justify the amount awarded; juries cannot simply pick a number. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

Further, only the pain and suffering that an injured person consciously experienced are compensable; damages for any pain or suffering during the time the injured person is unconscious are not permitted. *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 248 (Tex. App.—Texarkana 2005, no pet.).

The jury was instructed that physical pain and mental anguish "means the conscious physical pain and emotional pain, torment, and suffering experienced by Tranquilino Mendoza as a result of

the occurrence in question." The jury then awarded three million dollars for physical pain and mental anguish.

With regard to physical pain, appellants admit that photographs depicting Mendoza's injuries were introduced in evidence and that "it was undisputed at trial that his immediate, soft-tissue injuries looked 'horrible' and were 'terrible,' and that this was 'a terrible beating.'" They also admit that Paradez testified that when she saw her father at the emergency room immediately after the attack, she did not even recognize him. They also concede that Mendoza's medical records from Scenic Mountain Hospital indicate Mendoza received little pain medication because it was medically necessary not to over-medicate him while the doctors and nurses monitored his concussion. Nevertheless, appellants argue that no direct evidence of physical pain was presented. The existence of conscious pain, however, may be established by circumstantial evidence. *B.T. Healthcare, Inc. v. Honeycutt*, 196 S.W.3d 296, 301 (Tex. App.—Amarillo 2006, no pet.); *SunBridge*, 160 S.W.3d at 248. And, under certain circumstances, injuries may be "so substantial and the symptoms are so objective that an award of damages for pain and suffering is clearly supported." *SunBridge*, 160 S.W.3d at 248; *Dollison v. Hayes*, 79 S.W.3d 246, 249-50 (Tex. App.—Texarkana 2002, no pet.).

Appellants contend that "Mendoza's physical injuries healed quickly and were resolved by or near the time he was discharged from the hospital's transitional care unit." In making this argument, they emphasize that Dr. Farquhar, Mendoza's treating physician, testified that Mendoza was the same as before the attack when he was discharged from the transitional care unit less than two weeks later. They point to Dr. Lux's testimony that Mendoza achieved most of his recovery within a couple of weeks of the attack. And, they emphasize that the nurse's notes from the day after the attack indicate that Mendoza "denies pain."

However, in reviewing all the evidence, we hold that the evidence is factually sufficient to support damages for conscious pain. The evidence shows that Mendoza was conscious after the attack and, having been brutally beaten, was suffering from wounds that cannot have been pain-free. Manuela Bernal, a certified medication aid at Comanche Trail, testified that immediately following the attack, Mendoza was "beaten beyond recognition" and was bleeding all over his face. In documenting the attack, a Comanche Trail incident report noted that Mendoza had multiple cuts and hematomas on his head and face and that his left eye was swollen shut. The emergency medical technicians, upon arriving at the scene, found Mendoza in a chair in the lobby awake, alert, and in distress. The technicians noted that Mendoza had large hematomas on the left side of his face, lacerations above both eyes, on his left cheek, and in and behind his ears, all of which were bleeding. They also noted that blood was in his nose and mouth and that Mendoza "complained of pain to [his] face and his left eye" but "denied loss of consciousness or other injury."

Dr. Farquhar testified that Mendoza had "blunt face trauma about the face sustaining the laceration" located over his left eye, a "smaller laceration at the outer margin of the left eye," a "large hematoma over and under the eye," and was "bleeding from the ear." During Mendoza's stay at Scenic Mountain Medical Center, Dr. Farquhar's notes indicate that Mendoza "had serious wounds to his face" and that Dr. Farquhar "suspected that he had a cerebral concussion and possibly brain injury." Dr. Farquhar noted that Mendoza was "conscious" upon admission and recognized him. In addition to the facial bruising and lacerations, Dr. Farquhar noted that Mendoza "had several bruises and abrasions on the shoulders and forearms." Because Dr. Farquhar had questions about the seriousness of Mendoza's injuries, he was admitted into the hospital for three days and then admitted into a transitional care unit of the hospital for another nine days.

Further, the evidence shows that Mendoza was beaten with a quart-sized, double-shelled, insulated, water pitcher made of hard plastic that was filled with water. Mendoza was hit so hard with the pitcher that it shattered in pieces. The pain prevented him from eating normally for weeks after the attack. Additionally, after the attack, his speech was impaired and slurred and his "mouth drooped on the left side of his face." Even appellants' testifying neurological expert, Richard Senelick, agreed that Mendoza's slurred speech for eighteen to nineteen days after the attack could be due to distortion of his face or brain injury. Therefore, we hold that there was factually sufficient evidence of pain and suffering.

With respect to mental anguish damages, to support such an award, a party must present either (1) direct evidence of the nature, duration, and severity of his mental anguish, thereby establishing a substantial interruption in his daily routine; or (2) circumstantial evidence of high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Further, when a person is physically beaten with enough severity, mental anguish becomes far more likely than when the underlying event is not physical. *See Brown v. Sullivan*, 71 Tex. 470, 10 S.W. 288, 290 (1888) ("Where serious bodily injury is inflicted involving fractures, dislocations, etc., and results in protracted disability and confinement to bed, we know that some degree of physical and mental suffering is the necessary result."); *see also Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (quoting *Brown*). Thus, the supreme court has explained that "some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish." *Fifth Club,* 196 S.W.3d at 797 (quoting *Parkway*, 901 S.W.2d at 445).

Here, despite the severity of the attack on Mendoza, appellants argue that there is insufficient evidence to support damages for mental anguish. They point to Dr. Farquhar's testimony that based

on his observations, Mendoza was the same two weeks after the attack that he had been before the attack. According to Dr. Farquhar's notes, Mendoza had "recovered his ability to be the smiling, polite, lovely little old guy that [he] had known." However, appellants omit Dr. Farquhar's testimony that although he was not "proposing or defending the diagnosis of post-traumatic stress disorder," the symptoms from post-traumatic stress disorder "can come on at a different time."

Appellants also argue that there is also insufficient evidence of a substantial disruption in Mendoza's daily routine. They argue that Mendoza was able to perform the same activities after the attack as before, pointing to records that show he participated in sixteen of the seventeen activities offered in the transitional care unit. They point to Dr. Lux's testimony that there were other plausible explanations for Mendoza's behavioral changes after the attack, including his alcohol use, and the possibility that he did not like the Deerings facility or its food. Appellants also point to evidence that Mendoza's family removed him from the Deerings facility because the family could no longer afford to keep him there when his Medicaid eligibility status changed.

We, however, believe there was sufficient evidence to support the mental anguish damages awarded by the jury. The record shows that before the attack, Mendoza was a happy and social resident of Comanche Trail. He enjoyed visiting with other residents and attending activities in the nursing home. After the attack, however, Mendoza was fearful. Indeed, according to Dr. Mansfield, before the attack, there was no reference in the medical records from Comanche Trail to Mendoza having anxiety; however, after the attack, there were numerous references in the medical records to Mendoza suffering from "anxiety secondary to trauma." He was so afraid that he begged his daughter, Rosamarie, not to send him to another nursing home. When he went to the Deerings nursing home, Rosamarie had to spend the first three nights with him. According to Rosamarie, because the family knew how scared Mendoza was of staying in the nursing home, the family took

him out on passes much more often than they had at Comanche Trail. Notes from Deerings back up Rosamarie's testimony; they show that Mendoza's family took him out on daily passes twenty-one out of the seventy-one days he lived there.

According to Dr. Mansfield, Mendoza was suffering from post-traumatic stress disorder. Mendoza "couldn't control his environment very well; he couldn't take care of himself well; . . . and, so, after this, he became a withdrawn, different person than he was before." Thus, although not every day was a "bad" day for Mendoza, overall, Mendoza had a "change in his personality." "He was withdrawn and not sociable and in his room and wanted – whereas before he wanted to stay at Comanche Trail, he loved it; afterwards, he always wanted to get out of the nursing home, wanted to go out on pass with the family or stay home with the family." According to Dr. Mansfield, "it doesn't matter whether he had the label of [post-traumatic stress disorder] or whether he just had an ongoing emotional anxiety, psychological problem doesn't really matter. . . . [I]t did affect him the rest of his life, no matter what label you want to put on it." Mendoza remained fearful, anxious, withdrawn and in emotional distress from his admission to Deerings nursing home to his death. Even appellants' expert, Dr. Louis Lux, agreed that "there are psychological conditions that you can certainly get as a result of an experience like [Mendoza] went through, this attack," "like post-traumatic stress disorder, depression, anxiety, [and] acute stress reaction."

Looking at all the evidence, we hold that the evidence is factually sufficient to support the award for pain and mental anguish.

B.      *Physical Impairment*

The jury awarded seven million dollars for physical impairment. Physical impairment includes the loss of enjoyment of life. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003). To recover for physical impairment, a plaintiff must show that (1) the effect of any

physical impairment was substantial, and (2) the incurred injuries are distinct from, or extend beyond, any pain, suffering, mental anguish, lost wages, or diminished earning capacity. *Id.* Here, the jury was instructed that physical impairment "means a substantial loss of Tranquilino Mendoza's former lifestyle, extending beyond any pain, suffering, or mental anguish, sustained by him as a result of the occurrence in question." The jury was also instructed that it could "consider as a factor loss of enjoyment of life."

Appellants argue that the evidence is factually insufficient to support the award of damages for physical impairment. In doing so, they argue that medical records describe Mendoza "as having substantially the same lifestyle as he had before." They point to Dr. Farquhar's medical records that indicate Mendoza was the same after the attack as he was before the attack. And, they point to Dr. Mansfield's testimony that if medical records state one thing and a family member says something different, he would tend to favor the medical records. Thus, they argue we should discount Rosamarie Paradez's testimony.

According to Paradez, before the attack, her father had the "joy of life" in him and was loving and kind. Mendoza loved to go walking and play games with his grandchildren. He was jovial and would "joke around with his family and anyone else he met." He would sing traditional Spanish songs to his family and loved to play the guitar. He loved to go walking in the park and would only use a cane when he was sick. He was also conscious of his appearance. He regularly went to the barber and would ask his daughter to color his gray hair and mustache. He was very sociable. At Comanche Trail, he would talk to the staff and other residents. He would escort ladies to the dining room and other activities and would joke about marrying them. When at home with his family, he would eat dinner with them and liked to talk about current events.

After the attack, however, Paradez testified that her father was not the same man. He was not the extroverted man he once was. He did not want to be around anyone, including his own family, and became reserved and reclusive. While he lived with Paradez after the attack, he "didn't want to do anything." He would not eat with the family, but would take his meals to his bedroom. Later, when he was a resident at Deerings nursing home, he never wanted to leave his room. He lost interest in his physical appearance and "wanted to always stay in sweats or in a flannel jacket." He no longer wished to go to the barber and would not bathe regularly. He no longer sang, played the guitar, or played with his grandchildren. He did not walk as much and, when he did walk, had to use his cane or hold on to the walls to balance himself. He no longer read the newspaper or discussed the news. According to Paradez, her father was "physically there, but he was – he was not there."

Dr. Farquhar, Mendoza's treating physician, testified that Mendoza had sustained a "serious" head injury and that he was concerned that Mendoza had sustained "organic brain damage." Although Mendoza had a good recovery immediately after the attack, Dr. Farquhar agreed that this immediate recovery does not "necessarily negate the long-term consequences" of head injuries.

Dr. Vincent Di Maio, the Chief Medical Examiner for Bexar County, testified that his realm of expertise includes brain injuries caused by blunt-force trauma. Based on his examination of the evidence in this case, Dr. Di Maio testified that, in his expert opinion, Mendoza suffered brain injury as a result of repeated beatings during the attack. Dr. Di Maio explained that the number of blows coupled with their intensity and strength determines whether a person will suffer from permanent injury. Here, Mendoza sustained multiple blows to the head. From his examination of the shattered water pitcher (which had been filled with water), Dr. Di Maio was also able to determine that the intensity and force of the blows was "severe." Not only did Dr. Di Maio determine that Mendoza was struck with great force multiple times, but he also explained that because of Mendoza's age,

Mendoza's brain was more fragile and had more potential to be injured. He also explained that a concussion is a brain injury: "You can't have concussion without a brain – concussion means that you've had some trauma to the brain. You've disrupted the neurological system, disrupted the electrical system of the brain. That's what a concussion is."

Dr. Mansfield, Paradez's medical expert, testified that Mendoza suffered from a severe concussion as a result of the attack, which "caused an injury to his brain that basically changed the way his personality worked." And, because Mendoza was already suffering from brain shrinkage from the aging process, the blows to his head "destroyed even more of his neurons that were in his brain." In reviewing Mendoza's medical records, Dr. Mansfield noted documented instances of the changes in Mendoza's behavior and personality. After the attack, Mendoza was a "different person." According to Dr. Mansfield, these types of changes should be "expected after a major trauma like Mr. Mendoza suffered to his head and brain."

In reviewing all the evidence, we hold that the evidence is factually sufficient to support the award of physical impairment damages.

## RUNAWAY JURY

In an issue separate from sufficiency of damages, appellants argue that because the jury's award of damages was so excessive as to suggest the jury's finding resulted from "passion and prejudice," they deserve a new trial.

For support of this argument, appellants rely on *Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000). Unlike here, however, where all the appellants but Gundling stipulated to liability, in *Torrington* liability was the main issue. The appellant in *Torrington* argued that it was entitled to a new trial because "[a] jury that gets damages egregiously wrong probably got liability wrong, too." *Id.* at 851. In making this argument, the appellant relied upon a 1937 Texas Supreme Court Case,

*World Oil Co. v. Hicks*, 129 Tex. 297, 103 S.W.2d 962, 964 (1937), "as authority for looking to the amount of damages to hold that liability findings were erroneous." *Torrington*, 46 S.W.3d at 851. The court then analyzed whether the issue had merit:

> In *World Oil*, we noted that "[t]here are cases where a shockingly excessive verdict, *and the record as a whole, leave no room for doubt* that the minds of the jurors were so controlled and dominated by passion and prejudice as made them incapable of, or entirely unwilling, to consider a case on its merits." 129 Tex. 297, 103 S.W.2d 962, 964 (1937) (emphasis added). We emphasized, however, that remittitur is the appropriate remedy "unless [the verdict] is so flagrantly excessive that it cannot be accounted for on any other ground." *Id.* We did not disturb the verdict in that case, and we have never relied on *World Oil* to overturn a verdict.
>
> Since we decided *World Oil*, we have issued a number of decisions about the remedies for purportedly excessive verdicts. In *Pope v. Moore*, we held that an appellate court may not order a remittitur unless the evidence supporting damages is factually insufficient. *See* 711 S.W.2d 622, 623 (Tex. 1986). Concomitantly, trial courts may not order a remittitur when factually sufficient evidence supports a damages award. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). Because this Court is not empowered to determine factual sufficiency questions, *see Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736-37 (Tex. 1998), the continued vitality of *World Oil* is questionable. Nevertheless, the size of the verdict in this case and the record as a whole fails to **"leave no room for doubt" that the jury's liability findings resulted from passion or prejudice.**

*Id.* at 851 (emphasis in original) (bold-face emphasis added). However, because legal sufficiency of the evidence to support the damages awarded by the jury was not contested on appeal and because the record contained more than a scintilla of evidence to support *liability*, the court could not conclude based on the record that *the jury failed to consider the appellant's liability on its merits*. *Id.* at 551-52.

We decline to extend *Torrington* to this case. First, the supreme court in *Torrington* questioned whether *World Oil* was still viable. Second, *Torrington* is distinguishable because all appellants except Gundling stipulated to liability, and Gundling admitted liability in his trial testimony. Third, we have held that the damages are factually sufficient, and as explained in

*Torrington*, we may not order a remittitur unless the evidence supporting damages is factually insufficient. Fourth, even if we were to apply *Torrington*, looking at the merits of this case, we cannot say that the verdict here was "so flagrantly excessive that it cannot be accounted for on any other ground." There was evidence here to account for the jury's large verdict. We have already held that the damages for physical pain, mental anguish, and physical impairment were supported by factually sufficient evidence. And, although the punitive damages awarded by the jury seem large, the damages were less than the net worth data of the Summit Care appellants and less than the $640 million for which the Summit Care companies were sold in 2005.

We, therefore, overrule this issue.

## GUNDLING

Gundling argues that there is legally and factually insufficient evidence to support the jury's finding of negligence against him. He complains that there was no evidence as to the standard of care, which he argues should be what a reasonable regional vice president of a nursing home would have done.

In response, Paradez notes that the jury charge contained a special negligence instruction with regard to Gundling:

> "Negligence" when used with respect to the conduct of Robert Gundling, means failure to use ordinary care, that is, failing to do that which a regional vice president of a nursing home company of ordinary prudence would have done under the same or similar circumstances or doing that which a regional vice president of a nursing home company of ordinary prudence would not have done under the same or similar circumstances.

Paradez emphasizes that because Gundling did not object to his instruction, the evidence is measured against the charge as given. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) ("Since

neither party objected to this instruction, we are bound to review the evidence in light of this definition."); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

And, Paradez argues that although Gundling never stipulated to liability, he admitted liability on the witness stand. Indeed, at trial, when asked if he should have known Vela was a danger, Gundling responded, "[Y]es, I should have. Absolutely." The following exchange then occurred:

Q:      Okay. You were negligent. You failed to use ordinary care in doing
        your job, and that allowed this to happen, correct?

A:      By virtue of my position as regional vice-president for the company.

                                    ***

Q:      My point is it's your job to know, isn't it?

A:      It is.

                                    ***

Q:      If you were doing your job, you should have known what was going
        on, right?

A:      As regional vice-president for the company in my capacity, yes, sir.
        I should have known.

We, therefore, hold that the evidence is both legally and factually sufficient to show the standard of care and that it was violated.

### BANKRUPTCY COURT ORDER

According to the Summit Care Appellants, the judgment was improperly calculated because it "should have been limited to the amount of one damages cap under former article 4590i." They argue that because Finding of Fact No. 43 of the bankruptcy court order stated there is "only one surviving entity," the damages cap should apply only to that single entity.

In its order, the bankruptcy court noted that the effect of the damages cap was unforeseen when it entered the Summit Care reorganization plan. The court explained that under the reorganization plan, there is only one consolidated entity remaining, renamed "Fountain View, Inc.," and that all assets and obligations of each entity were effectively merged or pooled into Fountain View, Inc. Under the reorganization plan, Paradez was not allowed to bring duplicative claims against the consolidated entity:

> As a result of the substantive consolidation, on the Effective Date, all property, rights, and claims of the Debtors and the Estates, and all Claims against the Debtors and the Estates shall be deemed pooled for purposes of allowance, treatment, and distributions under the Plan and *multiple proofs of Claim on account of any Claim upon which any of the Debtors are co-obligors or guarantors or otherwise may be contingently liable shall without necessity of objection by any party be deemed to constitute a single proof of claim entitled to a single satisfaction from the substantively consolidated Estates in accordance with the terms of the Plan; the duplicative Claims being otherwise deemed disallowed.*

(emphasis in original). In clarifying what it had meant by "duplicative" claims, the bankruptcy court stated the following:

> *Clearly the intent was that claimants receive only one recovery for one claim*, and that the amount of recovery could not be multiplied because other related defendant debtors in the Summit group of companies might be jointly or severally liable for the same claim. In the same vein, liability that might attach merely because one entity was the alter ego of the other, or for which the corporate veil between the two might be pierced, or because of a guaranty, or because one entity was answerable for the acts of another under the doctrine of respondeat superior, would not by reason of these or similar legal doctrines be allowed to augment the claim beyond a single recovery. In other words, claims which derive solely from the fact that several of the debtor entities were related to each other, such as because of a parent/subsidiary relationship or general limited partner relationship, or respondeat superior relationship, and not because of independent tortious (or other) activity of the related entity, would be disallowed.

> The logic of this is clear. The Plan promised 100% recovery of allowed claims. Therefore, unlike the usual pleading practice of naming all conceivably responsible parties under all conceivably applicable theories, in order to reach deep pockets and assure a full recovery, it would be unnecessary under the Plan to seek to attach such liability also to parent companies, partners, or co-obligors, because all assets and

> liabilities are pooled and recovery is therefore assured from the primary tortfeasor. Moreover, as argued by [Summit Care], this was a very necessary provision to encourage cooperation from the bankruptcy estates' insurers who could be assured that they would not be expected to pay for duplicative claims, and to avoid the hugely expensive process of trying to litigate all cross claims between separate entities.

(emphasis added).

The bankruptcy court then noted that the plaintiffs' current petition ran afoul of these provisions because it alleged the corporations to be jointly and severally liable. The court emphasized that "[o]nly one measure of this damage is permitted; as to which is the primary alleged tortfeasor, that will be left to the trier of fact in Texas or to the Texas court, but *only one count is allowed*, irrespective of whether the Texas statute applies." (emphasis in original). "All this Court can say is that, to the extent that any liability is imposed for reasons other than *that defendant's primary acts, or failure to act*, it is disallowed; this would include theories such as *respondeat superior*, alter ego, piercing the corporate veil, guarantor or the like. The overarching concept to keep in mind is that Mendoza should only receive compensation for a specific tort *one time*." (emphasis in original).

Here, there is evidence to support individual acts of negligence by each of the appellants.

Summit Care Corp. formulated the concept of creating an Alzheimer's Unit but did not get certification from the State of Texas. It had the idea of stripping the nursing staff of their ability to use their own judgment for those whom they were providing care. It recruited patients from the V.A.'s psych ward, representing to the V.A. that it could provide care for these patients in its Alzheimer's Unit. It pushed the nursing home to increase occupancy at any cost.

Summit Care Texas, L.P., which operated Comanche Trail, was responsible for Mendoza's care. It was the subject of an official TDHS investigation, which found that the nursing home knew about Vela's violence, but never reported it and never took any steps to prevent the attack on

Mendoza. It was responsible for assessing Vela and making sure that he was capable of living in the nursing home. It was responsible for preventing Vela from beating other residents. Before the attack on Mendoza, it had the responsibility of informing Vela's physician of his previous violent behavior. On September 3, 1997, before the attack on Mendoza, it ignored Vela's doctor's order to get a psych consult for Vela. It ignored Vela's doctor's order to keep Vela in a locked unit. And, it placed Vela in a room with Mendoza, the room farthest from the nurses' station.

Before the attack on Mendoza, Casas, the administrator, knew about Vela's violent behavior toward others. She had been warned of Vela's violent behavior by the Director of Nursing, the Assistant Director of Nursing, and a social worker. And, despite those warnings, she transferred Vela, in violation of his doctor's orders, from the locked unit to Mendoza's room. She also had an independent responsibility as a licensed administrator in the state to ensure that care was adequate.

Gundling, Summit Care Corp.'s regional vice-president, should have known what was going on in the nursing home. He should have known about each incident of violence. He was making daily and weekly calls to Casas about the census and pushing her to increase occupancy. Carol Swafford, the director of nursing, also testified that although she told Gundling that she needed more staff, he refused.

Thus, Paradez had different theories of negligence against each appellant, and there was evidence that each appellant committed individual acts of negligence. And, the jury broke down each appellant's responsibility into percentages, making Paradez's recovery 100%. Therefore, contrary to the Summit Care Appellants' assertions, the judgment is in accordance with the bankruptcy court order; the Summit Care Appellants are not liable for duplicative claims.

We overrule this issue.

**DAMAGES CAP UNDER FORMER ARTICLE 4590I**

*A.      Were Summit Care Corp. and Gundling health care providers under former article 4590i?*

Summit Care Corp. and Gundling argue that the trial court erred in not applying former article 4590i's damages cap. We disagree.

With regard to Summit Care Corp., it is undisputed that the license to operate a nursing home was transferred from Summit Care Corp. to Summit Care Texas, L.P., on September 1, 1997, *before* Vela's attack on Mendoza, which occurred on September 28, 1997. Thus, the trial court found that because the cause of action accrued on September 28, 1997, Summit Care Corp. was not a protected health care provider as that term is defined by former article 4590i.

Former article 4590i, section 1.03(a)(3) defines a health care provider as the following:

> "Health care provider" means any person, partnership, professional association, corporation, facility, or institution *duly licensed or chartered by the State of Texas to provide health care* as a registered nurse, hospital, dentist, podiatrist, pharmacist, or nursing home, or an officer, employee, or agent thereof acting in the course and scope of employment.

Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(3), 1977 Tex. Gen. Laws 2039 (former TEX. REV. CIV. STAT. art. 4590i, § 1.03(a)(3)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847 (emphasis added).

It is undisputed that on September 28, 1997, Summit Care, Texas, L.P. and Casas were "health care providers" as defined by former article 4590i. Further, it is undisputed that on September 28, 1997, Summit Care Corp. had already transferred its license to Summit Care, Texas, L.P. Thus, because Summit Care Corp. was not licensed on September 28, 1997, the trial court found that Summit Care Corp. and its employee, Gundling, were not health care providers. Therefore, the trial court did not apply former article 4590i's damages cap to Summit Care Corp. and Gundling.

On appeal, Summit Care Corp. and Gundling argue that the trial court erred in not applying former article 4590i's damages cap because some of the alleged acts of negligence occurred before September 28, 1997, when they were licensed. In response, Paradez argues that the proper focus is the date the cause of action accrued. We agree with Paradez.

The definition of "health care provider" does not say *when* an entity must be licensed. It merely states that a health care provider is one that is licensed. Nor does the definition of a "health care liability claim" address this issue:

> "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

Former TEX. REV. CIV. STAT. art. 4590i, § 1.03(a)(4). Nor does the section of former article 4590i that discusses the damages cap address this issue:

> In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.[7]

Former TEX. REV. CIV. STAT. art. 4590i, § 11.02(a). Therefore, we have little guidance from the actual statute on this issue.

However, logically, the accrual of the cause of action must be the appropriate dividing line. Under appellants' interpretation, if one act of negligence occurred during the time Summit Care Corp. was licensed but before Mendoza's cause of action accrued, it would have protection of the damages cap despite voluntarily and intentionally transferring its license to another entity and thereby not complying with the definition of a "health care provider." We must attach significance

---

[7]This damages cap is adjusted for the consumer price index. *See* Former article 4590i, § 11.04.

to the Legislature's decision to define a health care provider as one that is *duly licensed or chartered by the State of Texas to provide health care*. Appellants' interpretation would eviscerate the requirement that a health care provider be licensed.

We also note that Summit Care Corp. and Gundling rely on *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005), in support of their argument. However, the issue in *Diversicare* was whether the plaintiff's claim was a health care liability claim; the issue was not whether the defendant was a health care provider. Under section 11.02, for the damages cap to apply, both must exist: a health care liability claim against a health care provider.

We, therefore, overrule this issue.

B.      *Under former article 4590i, should the damages cap apply to each defendant separately or should only one cap apply?*

Appellants also argue that "the judgment was improperly computed" because the trial court "stacked" the damages cap under section 11.02(a) of former article 4590i. According to appellants, the trial court should have applied only one damages cap. We disagree.

As noted previously, section 11.02(a) provided that when a "final judgment is rendered against *a physician or health care provider*, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000." Former TEX. REV. CIV. STAT. art. 4590i, § 11.02(a).

In interpreting section 11.02(a), in *Rose v. Doctors Hospital*, 801 S.W.2d 841, 847 (Tex. 1990), the Texas Supreme Court held that this damages cap should be applied on a per-defendant, instead of a per-plaintiff, basis:

> It is clear that the damages cap amounts should be calculated on a "per defendant" basis because the language of § 11.02(a) clearly applies to the recovery against the individual defendant, not the award to the individual plaintiff. Plaintiffs who recover

> against more than one defendant may therefore obtain a judgment in excess of the cap, so long as the combined statutory liability of all defendants is not exceeded.
>
> Thus, the amount of damages in this case is the damages cap of $500,000, plus a consumer price index adjustment to the present (*see* TEX. REV. CIV. STAT. ANN. art. 4590i § 11.04), multiplied by two since there are two culpable defendants in this case. Judgment is hereby rendered accordingly.

*Id.* at 847. However, in so holding, the court specifically noted that it was not addressing "the applicability of this damages calculation to the comparative negligence situation. This case does not involve a situation in which any defendant is less than completely liable." *Id.* at 847 n.2.

In *Columbia Hospital Corp. v. Moore*, 43 S.W.3d 553 (Tex. App.—Houston [1st Dist.] 2001), *modified on other grounds*, 92 S.W.3d 470 (Tex. 2002), the court of appeals was faced with this comparative negligence situation, but in the context of joint and several liability. In *Columbia Hospital*, the jury found that all three defendants were negligent and assessed responsibility at 60% for the hospital, 30% for one doctor, and 10% for the other doctor. *Id.* at 555. On appeal, the hospital argued that the trial court erred by using the hospital's joint and several liability to award damages in excess of the single damages cap. *Id.* at 562. In essence, because the hospital was jointly and severally liable for the doctors' negligence, under the judgment, the hospital was liable for an amount in excess of the damages cap.

In considering whether the damages cap should only apply once in the context of joint and several liability, the court of appeals emphasized that section 11.02(a) "states unambiguously that liability of 'the' health care provider 'shall' be limited to the cap." *Id.* at 563. And, the court reasoned that this plain reading of statute comported with the MLIIA's purpose "to 'reduce excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems,' thereby making health care and its liability insurance more affordable and available." *Id.* (quoting subsections 1.02(b)(1)-(2),

(4)-(5) of former article 4590i). Thus, the court reasoned that the plain language led it "to conclude that the damages cap applicable to a single defendant *who is jointly and severally liable* may not be multiplied by the number of culpable defendants." *Id.* at 566 (emphasis added).

Here, however, we do not have joint and several liability. Section 33.013 of the Texas Civil Practice and Remedies Code provides that a defendant will be jointly and severally liable for the damages recoverable by a claimant if the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than fifty percent. TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(b)(1) (Vernon Supp. 2007). In this case, the jury found Summit Care Corp. to be 35% responsible; Summit Care Texas, L.P., to be 35% responsible; Casas to be 25% responsible; and Gundling to be 5% responsible. Thus, because no party was found to be more than fifty percent responsible for the damages, there is no joint and several liability. And, as noted previously, there was evidence to support individual acts of negligence against each of the defendants. Thus, unlike *Columbia Hospital*, this is not a case in which a single defendant, because of joint and several liability, is liable for more than the damages cap. Instead, under the judgment, each of the defendants, to which the cap is applicable, is liable for an amount equal to one damages cap. In doing so, the judgment is consistent with section 11.02(a)'s unambiguous language that liability of "the" health care provider shall be limited to the cap.

We therefore hold that the trial court did not err in applying the damages cap under former article 4590i.

### EXEMPLARY DAMAGES

According to the Summit Care Appellants, because chapter 41 of the Texas Civil Practice and Remedies Code places a limit on the amount of punitive damages recoverable against "a defendant" and because the bankruptcy order expressly states that there is only one entity in this

lawsuit, only one cap on exemplary damages can be awarded. In response, Paradez argues that the bankruptcy court never eliminated each entity's individual liability. We agree with Paradez.

Section 41.008(b) provides that exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1)     (A) two times the amount of economic damages; plus

        (B) an amount equal to any noneconomic damages found by the jury,
        not to exceed $750,000; or

(2)     $200,000.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (Vernon Supp. 2007). Thus, appellants argue that because there is only "one surviving entity defendant," exemplary damages can be assessed only once. The bankruptcy court's order, however, did not limit Paradez's recovery in this manner; it just sought to prevent duplicative claims and to ensure that the plaintiff's allegations were against the primary tortfeasor. And, as explained previously, Paradez did not recover duplicative claims. We, therefore, overrule this issue.

## CONCLUSION

For the reasons stated above, the trial court's judgment is affirmed.


                                        Karen Angelini, Justice