

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-24-00553-CV

Jonathan Paul **JONES**,
Appellant

v.

Raquel **HATCH** and James McCowan, Jr., Individually,
and as Representatives of the Estate of Taylor McCowan,
Appellees

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2020-CI-02447
Honorable Rosie Alvarado, Judge Presiding

Opinion by:    Adrian A. Spears II, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Adrian A. Spears II, Justice

Delivered and Filed: April 1, 2026

REVERSED AND RENDERED IN PART, AFFIRMED IN PART CONDITIONED ON FILING
OF REMITTITUR

Twenty-three-year-old Taylor McCowan died from injuries sustained in a motor vehicle

collision. Taylor's parents, Raquel Hatch and James McCowan Jr., filed wrongful death and

survival claims against Jonathan Paul Jones, the driver of the pickup truck that collided with

Taylor's sedan. A jury awarded Taylor's parents and her estate actual and exemplary damages

totaling more than $81 million, and the trial court entered judgment on the jury's verdict.

On appeal, Jones argues the judgment must be reversed because (1) the actual damages awarded are not supported by sufficient evidence, (2) the amount of exemplary damages are capped at $750,000 based on Hatch and McCowan's pleadings, (3) findings essential to the exemplary damages awarded are not supported by sufficient evidence, and (4) errors exist in the jury charge.

We conclude the evidence is legally insufficient to support the pecuniary loss damages awarded to Hatch and McCowan and reverse and render judgment that they recover nothing in pecuniary loss damages. We also conclude that the amounts of mental anguish and loss of companionship and society damages awarded to Hatch and McCowan, and the amount of pain and mental anguish damages awarded to Taylor's estate are excessive. As requested by both sides, we suggest a remittitur as to these damages. We further conclude that the recovery of exemplary damages is not capped, and that the evidence is legally and factually sufficient to support the award of exemplary damages. We finally conclude there is no charge error.

### BACKGROUND

The evidence presented at trial showed that on January 31, 2020, Jones drove the wrong way up a freeway on-ramp and headed into oncoming traffic. Taylor was driving on the freeway when her Nissan Sentra sedan was struck head-on by Jones's Ford F-150 pickup truck. The impact of the collision crushed the front end of Taylor's sedan. Because the sedan doors would not open, firefighters cut off the roof to remove Taylor from the wreckage. Taylor sustained multiple blunt force injuries, including head injuries, internal injuries, and broken bones. She was transported to the emergency room by ambulance. By the time Taylor was admitted to the hospital, she was unconscious.

Taylor's parents lived in the Houston area. Upon learning of the collision, they rushed to San Antonio to be with their daughter. Doctors treated Taylor at the hospital, but the effects of her serious injuries were irreversible. Five days after the collision, Taylor was transferred to a hospital in Houston, where her parents took turns staying at her bedside. After fifteen days in the hospital, Taylor died from complications related to her extensive injuries.

Taylor had grown up in the Houston area, and she was a member of a tight-knit family. She had multiple siblings and maintained a good relationship with her parents, who were divorced. After graduating from high school, Taylor and her twin sister decided to attend the same university in San Antonio. Taylor was interested in pursuing a career in nursing. After graduating from the university, Taylor and her twin sister decided to remain in San Antonio. At the time of the collision, Taylor had just started a new job at a hospital. Taylor was an especially caring young adult and a beloved family member. Her parents were deeply affected by Taylor's tragic, premature death.

The jury found that Jones's negligence proximately caused the fatal collision, that Jones operated a motor vehicle in a public place while intoxicated, and that his intoxication caused Taylor's death. The jury awarded Hatch and McCowan the following actual damages: (1) $10 million each for their past mental anguish; (2) $5 million each for their future mental anguish; (3) $1 million each for their past loss of companionship and society; (4) $5 million each for their future loss of companionship and society; (5) $300,000 each for their past pecuniary loss; and (6) $1 million each for their future pecuniary loss. It also awarded Taylor's estate $24 million for Taylor's pain and mental anguish. The jury further found, by clear and convincing evidence, that the harm to Taylor resulted from Jones's gross negligence, and awarded Taylor's estate $13.12 million in exemplary damages.

The trial court rendered judgment on the jury's verdict awarding (1) Hatch, individually, actual damages in the amount of $22.3 million; (2) McCowan, individually, actual damages in the amount of $22.3 million; and (3) Taylor's estate actual damages in the amount of $24 million and exemplary damages in the amount of $13.12 million. Jones appealed.

**ACTUAL DAMAGES**

On appeal, Jones argues that the evidence is legally and factually insufficient to support the actual damages awarded to Hatch and McCowan and Taylor's estate, and that these actual damages are "excessive." A complaint that damages are excessive is a factual sufficiency complaint. *Anderson v. Durant*, 550 S.W.3d 605, 620 (Tex. 2018).

## A. Standards of Review

In reviewing damage awards, we apply the traditional sufficiency standards of review. In reviewing the legal sufficiency of the evidence, we consider all the record evidence in the light most favorable to the party in whose favor the verdict has been rendered. *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 640 (Tex. 2023). In conducting our review, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id*.

In reviewing the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of and contrary to the challenged finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). "The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and

preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). "[W]e employ the same standard of review for an excessive damages complaint as for any factual sufficiency of the evidence complaint." *Casas v. Paradez*, 267 S.W.3d 170, 185 (Tex. App.—San Antonio 2008, pet. denied).

In reviewing the sufficiency of the evidence to support the jury's findings, we cannot substitute our judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury is the sole judge of the credibility of the witnesses, and we defer to its credibility determinations. *Id*.

Absent an objection to the jury charge, we measure the sufficiency of the evidence against the charge as written. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

**B. Hatch and McCowan's Invited Error and Estoppel Arguments**

As a preliminary matter, Hatch and McCowan contend that Jones is barred from challenging the sufficiency of the evidence to support the mental anguish and loss of companionship and society damages awarded based on the doctrines of invited error and estoppel. "The invited-error doctrine, like estoppel, may operate when a party has taken some previous action or position that is inconsistent with its current position." *In re G.X.H.*, 627 S.W.3d 288, 301 (Tex. 2021) "Generally, the invited error doctrine applies when a party requests a court to make a specific ruling and then complains about the ruling on appeal." *Saeco Elec. & Util., Ltd. v. Gonzales*, 392 S.W.3d 803, 806 (Tex. App.—San Antonio 2012, pet. granted, judgm't vacated w.r.m.). For estoppel to apply, a litigant "must have unequivocally taken a position in the trial court that is clearly adverse to its position on appeal." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005).

To support their invited error and estoppel arguments, Hatch and McCowan focus on the following comments made by Jones's counsel in closing arguments:

> Now, many of you asked during voir dire, *how can you put a price on a person's life?* And I know that's a hard thing, but *that's the question that the attorneys here have asked you to do.*
>
> ....
>
> *I'm not going to put a price on a human's life. That's not what I'm going to do. That's a decision all of y'all have to make.*

(emphasis added). Hatch and McCowan did not object to these comments during trial. Now, on appeal, they argue that "having repeatedly told the jury that its job was to put a value or 'price' on Taylor's life, Jones cannot complain now if the jurors did exactly what counsel told them to do."

The cited excerpts do not show that Jones asked for a specific ruling or that he took a position clearly adverse to his position on appeal. Instead, the excerpts show that Jones's counsel acknowledged the difficulties inherent in determining noneconomic damages in wrongful death cases. *See Gregory v. Chohan*, 670 S.W.3d 546, 556 (Tex. 2023) (plurality op.) ("Any attempt to monetize the grief experienced by those whose loved ones die suddenly and prematurely will fail in its paltry attempt to compensate with money that which is priceless.").[1] The comments made by Jones's counsel are not inconsistent with his sufficiency challenges. We conclude that Jones's sufficiency complaints are not barred by the invited error or the estoppel doctrines.

---

[1]In *Gregory*, the plurality further observed:

> The love we feel for those closest to us—and the pain we would feel at their passing—far exceeds any price that could ever be paid. . . . [W]e are well aware of the insurmountable imperfection of any attempt to use money damages to compensate for the emotional injuries alleged in a wrongful death case. Imperfect justice is all that can be offered to grieving families who cannot truly be made whole, but it should be said that the entire enterprise of assigning dollar values to matters of the heart is exceedingly imperfect indeed. Nevertheless, existing Texas law authorizes such recoveries, and our justice system must proceed in this realm, as in all others, on the basis of evidence and reason.

670 S.W.3d at 556–57.

**B**. **Parents' Mental Anguish**

The jury awarded Hatch and McCowan $10 million each in past mental anguish damages and $5 million each in future mental anguish damages. Jones argues the evidence is legally and factually insufficient to support the amounts of mental anguish damages awarded to Hatch and McCowan.[2]

The term "actual damages"—used interchangeably with the term "compensatory damages"—is defined as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171-72 (Tex. 2013) (citing BLACKS'S LAW DICTIONARY 445 (9th Ed. 2009)). "Compensation is the chief purpose of damages awards in tort cases." *J&D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016). "Compensatory damage awards are meant to compensate victims, not to punish or deter tortfeasors." *Gregory*, 670 S.W.3d at 556 (plurality op.).

Generally, to recover mental anguish damages, a plaintiff must present "direct evidence of the nature, duration, and severity of [his or her] mental anguish, thus establishing a substantial disruption in the plaintiff['s] daily routine" or a "high degree of mental pain and distress that is more than worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (internal quotation marks omitted). The purpose of mental anguish damages in a wrongful death case is to compensate family members "for their harrowing

---

[2]In arguing that the amounts of mental anguish and loss of companionship and society damages awarded are "not fair and reasonable compensation," Jones relies on the plurality opinion in *Gregory;* however, plurality opinions are persuasive, not precedential, authority. *See Elizondo v. Reyna*, No. 04-24-00284-CV, 2025 WL 2462764, at *9 (Tex. App.—San Antonio Aug. 25, 2025, no pet.) (noting that *Gregory* is a plurality opinion lacking in precedential value). In *Gregory*, family members brought a wrongful death action after a truck driver, who was a husband, son, and father of three, died in a multi-vehicle accident. 670 S.W.3d at 550 (plurality op.). The jury awarded the decedent's six family members slightly more than $15 million in noneconomic damages, that is, past and future mental anguish and loss of companionship damages. *Id*. Among other things, a plurality of the Court concluded the evidence was legally insufficient to support the amounts of noneconomic damages awarded. *Id*. at 564. Based on additional errors, the remaining participating justices concurred in the judgment and the Court reversed and remanded the case for a new trial. *Id*. at 575, 577 (Devine, J., concurring), (Bland, J., concurring).

experience resulting from the death of a loved one." *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986) (internal quotation marks omitted). Thus, mental anguish represents the plaintiff's emotional response to the wrongful death itself. *Id*. at 687. "All wrongful death actions are predicated on the proposition that a wrongful death necessarily destroys any pre-existing family relationship." *Id*. at 685. A physical manifestation of mental anguish is evidence of the extent or nature of the mental anguish suffered. *Id*. at 686.

Mental anguish and loss of companionship and society damages are noneconomic in nature and, as a result, they cannot be determined with mathematical precision. *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002). For this reason, juries are afforded some latitude in awarding mental anguish and loss of companionship and society damages. *Id*. "But the necessity that a jury have some latitude in awarding such damages does not, of course, give it carte blanche to do whatever it will." *Id*. "Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded." *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). "While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited." *Id*. "Juries cannot simply pick a number and put it in the blank." *Id*. "They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Id*.

Furthermore, the law requires appellate courts to conduct a meaningful review of mental anguish damage awards to ensure that they are fair and reasonable. *Id*. "The courts of appeals are authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable." *Bentley*, 94 S.W.3d at 606.

Here, the jury charge defined "mental anguish" as "the emotional pain, torment[,] and suffering experienced by [Hatch and McCowan] because of" Taylor's death. At trial, both Hatch and McCowan testified about their emotional responses to Taylor's extensive injuries and her death. When Hatch first saw Taylor at the hospital, her "heart just dropped" and she felt "an emptiness" because she was looking at Taylor, but Taylor was "not there." Taylor's hair was gone because she had undergone surgery to relieve the pressure on her brain; she had scars on her face; and her leg was broken and suspended because the doctors were "trying to hold it together." Taylor had tubes and lines running in and out of her body. Seeing Taylor in this condition was Hatch's "worst nightmare."

Hatch recounted how she spent five days at Taylor's bedside in the hospital in San Antonio. Taylor's siblings, who also gathered around her, had hope that Taylor would recover, but Hatch knew that Taylor was not coming back because of the trauma to her brain. Hatch's own pain was exacerbated by the pain exhibited by Taylor's siblings. Taylor's transfer to a Houston hospital was also emotionally difficult and heartbreaking. Not only were there "touch and go" moments during Taylor's transport, but Hatch felt helpless because she was unable to change what was about to happen. After Taylor was transferred to a Houston hospital, Hatch stayed with her at the hospital every day, while Taylor's father, McCowan, stayed with her every night. It was difficult for Hatch to watch Taylor deteriorate in a hospital bed. The morning Taylor died, Hatch had not gone to the hospital because she was ill with a fever. When Hatch received the call that Taylor died, she "just broke down."

Immediately after Taylor's death, Hatch missed about four months of work. Additionally, Hatch "had screaming fits" and "almost uncontrollable rage." Hatch had no appetite. She also had nightmares. When Hatch closed her eyes, the trauma surrounding Taylor's death flooded back; she

remembered seeing Taylor in the hospital and seeing her crushed sedan. For an unspecified period of time, Hatch saw a therapist on a weekly basis. Sometimes Hatch was unable to sleep for two or three days. Her primary care physician prescribed Hatch medication to help her sleep and for her mental anguish, but Hatch took these medications on an as-needed basis only. Furthermore, when Hatch's deposition was taken thirty-three months after Taylor's death, Hatch could not remember the last time she had refilled her medications. At trial, Hatch confirmed that she had not taken her medications in the preceding six to eight months.

Hatch testified that she "push[es] through" because that is what Taylor would have wanted her to do. Hatch added that there are still times—like Taylor's birthday and the anniversary of the accident—when she is "not really engaged" and "has to take time off every now and then just to regroup." As the anniversary of Taylor's death approaches, her heart "is always aching and hurting" and she is "not sleeping." During these times, Hatch reaches out to her therapist. Hatch added that when the anniversary of Taylor's death approaches, McCowan "shuts down completely." According to Hatch's testimony, the family did not celebrate the first Easter and Thanksgiving after Taylor's death. However, the family's recent holiday celebrations were better.

McCowan testified about how he and Hatch rushed to San Antonio as soon as they heard that Taylor had been in a collision. When McCowan first saw Taylor at the hospital, he thought "this [is] not good" and "[b]est case scenario, she's going to need around the clock care for the rest of her life." He noticed that Taylor's "beautiful head of hair" was gone, she had a bandage where the plate of her skull had been removed, and she had a blank stare. He first felt anger and then the anger left and was replaced by a "profound sadness" because he would never get to walk Taylor down the aisle and he would never have any more Sunday conversations with her.

McCowan further recalled that Taylor remained in the hospital in San Antonio for four or five days. The doctors told McCowan that he needed to think about disconnecting Taylor from the life-support machines, but he resisted. McCowan "wanted [Taylor] to transition when she was ready," "not because [her family] pull[ed] the plug." The family decided to transfer Taylor to a hospital in Houston. While watching Taylor slowly slip away, McCowan felt helpless. McCowan recalled: "It was agonizing, because as a dad, I'm a fixer," but he could not fix this. McCowan stayed by Taylor's side every night until she passed away. When Taylor died on February 15, 2020, McCowan was with her.

After Taylor's death, McCowan "fell into a depression." He did not want to get out of bed. He stopped sleeping and had no appetite. He lost thirty pounds. However, about ten weeks after Taylor's death, McCowan began a college program to pursue a degree in occupational therapy. McCowan "pushed through" his feelings and started the college program because he had promised Taylor he would do so. By the time of trial, McCowan had completed the college program and graduated. Finally, McCowan testified that he still cries when he visits Taylor at the cemetery and he still cannot sleep more than two hours a night.

We conclude this evidence constitutes legally sufficient evidence to support an award of past and future mental anguish damages. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 233 (Tex. 2011) (concluding some evidence existed to support the jury's finding plaintiff suffered the degree of mental pain and distress that would support some damages for mental anguish). However, we must still determine if the amounts awarded are supported by factually sufficient evidence. *See Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017) ("The amount awarded must be fair and reasonable compensation, given the evidence presented."). In other words, we must determine if the amounts awarded are excessive.

"[M]any courts have approved large mental anguish awards if there is evidence of severe mental anguish, while smaller awards have been affirmed when the evidence merely showed a close familial relationship." *Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594, 637 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.), *abrogated on other grounds by Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143 (Tex. 2015); *see also Hawkins v. Walker*, 238 S.W.3d 517, 527-31 (Tex. App.—Beaumont 2007, no pet.) (surveying cases involving high mental anguish damage awards and the type of evidence required to sustain them). "While there is a presumption of some mental anguish from the death of a family member, that presumption does not also require the court to find that the evidence is factually sufficient to support an extremely large award." *Wackenhut Corr. Corp.*, 305 S.W.3d at 637. Factual insufficiency exists when the evidence supporting the finding is so weak, or when the evidence contrary to the finding is so overwhelming, that the finding should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

"[I]n appropriate circumstances, awards in similar cases may be relevant in analyzing whether an award of damages is excessive." *Critical Path Res., Inc. v. Cuevas*, 561 S.W.3d 523, 568 (Tex. App.—Houston [14th Dist.] 2018, pet. granted, judgm't vacated w.r.m.); *see Anderson*, 550 S.W.3d at 620 ("The jury's $400,000 award appears to be excessive compared to awards in cases involving other similar or more egregious behavior."); *Gordon v. Redelsperger*, No. 02-17-00461-CV, 2019 WL 619186, at *5 (Tex. App.—Fort Worth Feb. 14, 2019), *supplemented*, 2019 WL 1065916, at *1 (Tex. App.—Fort Worth Mar. 7, 2019, no pet.) ("In the search for a quantifiable standard to tether an analysis, courts may also look to awards in similar cases for guidance on whether the award under review is excessive.").

Two cases are particularly instructive here. Both cases involved mental anguish damages awarded to parents of adult children who died from catastrophic injuries. In the first case, *Cuevas*, the parents sued for wrongful death after their son died from burn injuries sustained in a refinery explosion. 561 S.W.3d at 536. When the mother and father visited their severely injured son in the hospital, the doctors told them his prognosis was dire. *Id*. at 576. On doctor's advice, the mother decided that her son would receive comfort measures only. *Id*. The mother testified that seeing her son dying was "the saddest day of [her] life" and the experience "changed [her] life forever." *Id*. The mother explained that her faith motivated her to get up every day. *Id*. After four days in the hospital, the son died while his father was with him. *Id.* The father was emotionally and physically affected by this experience, developing high blood pressure and heart problems, which eventually led to the father's hospitalization and heart surgery. *Id*. Additionally, the father's personality changed completely after his son's death, transforming him from an outgoing, active person to a grouchy, quiet person, who was no longer interested in his former activities. *Id*. Based on this evidence, the jury awarded each parent $2.5 million in past mental anguish damages and $2.5 million in future mental anguish damages, which is substantially less than the jury awarded Hatch and McCowan. *See id*. at 574. The court of appeals concluded that while there was evidence to support some amount of mental anguish damages to each parent, the jury's $5 million award to each parent for their past and future mental anguish was excessive. *Id.* at 577.

In the second case, *Lawhorn v. Hidinger*, the parents sued for wrongful death after their twenty-five-year-old son died from injuries sustained in a motorcycle accident. The evidence showed that the son was driving his motorcycle on a highway when a pickup truck pulled out in front of him. No. 13-16-00423-CV, 2019 WL 1288371, at *1 (Tex. App.—Corpus Christi-Edinburg 2019, no pet.), *supplemented*, 2019 WL 1723507, at *1 (Tex. App.—Corpus Christi-

Edinburg Apr. 18, 2019). Both parents had enjoyed a close relationship with their son. *Id*. at *4-5. Although they lived in different states, the parents and son spent holidays and vacations together. *Id*. at *4. The father and son still engaged in many activities together. *Id*. at *5. The mother described her son as her best friend. *Id*. at *4. When her son was alive, she communicated with him almost every day, either through texts or phone calls. *Id*. When the parents learned the son was in an accident, they arranged to get on the next flight, but he died before they made it to the hospital. *Id*. at *4. The father felt disbelief and "blank" after his son's death, and he thought about him every day. *Id*. at *5. The father put on a "fake smile" at work, but he cried when he was alone. *Id*. The father did not seek any treatment from a doctor. *Id*. Since her son's death, the mother was having a "rough time." *Id*. at *4. She no longer felt positive and she found it hard to work. *Id*. After her son's death, the mother started having panic attacks for which she sought treatment from a doctor. *Id*. By the time of trial, the mother was still taking medications for her panic attacks and to help her sleep. *Id*. The mother had never needed these medications before her son's death. *Id*. She was also seeing a psychiatrist. *Id*. at *5. The mother believed that she and her husband would never get over their son's death. *Id*. Based on this evidence, the jury awarded each parent $1 million in past mental anguish damages and $250,000 in future mental anguish damages, which is far less than the jury awarded Hatch and McCowan. *See id*. at *6-7. The court of appeals affirmed the mental anguish damages awarded to the parents, holding that the evidence was legally and factually sufficient to support the $1 million in past mental anguish damages and $250,000 in future mental anguish damages awarded to each parent. *Id*. at *7.

Although it is appropriate to consider similar cases in analyzing whether an award of damages is excessive, we must nevertheless evaluate each case on its own facts, considering and examining the evidence presented. *Cuevas*, 561 S.W.3d at 568. When we reverse for factual

insufficiency, we are obligated to analyze the evidence on both sides of the issue, at least in a brief and general way, and point out why the evidence supporting the challenged finding is weak or contrary to the great weight and preponderance of the evidence. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *see also Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006). "Lower courts should examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust." *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).

Here, the evidence showed that both parents experienced a high degree of mental pain and distress while Taylor was hospitalized, and in the months immediately following her death. Both Hatch and McCowan suffered from a loss of appetite and sleeplessness. Hatch stopped working for a time. McCowan lost thirty pounds, was "in a depression," and did not want to engage in daily activities. Nevertheless, about ten weeks after Taylor's death, McCowan began a college program, which he was able to successfully complete before this case went to trial. About four months after Taylor's death, Hatch was able to return to work.

Not long after Taylor's death, Hatch's primary care physician prescribed her medication for her sleeplessness and mental anguish. Hatch also participated in weekly therapy sessions. However, by November 2022, which was about thirty-three months after Taylor's death, Hatch no longer needed this medication or regular therapy sessions. Hatch noted that there were still occasions—like Taylor's birthday and the anniversary of her death—when she took time off from work "to re-group" or participated in therapy sessions. Nevertheless, Hatch's testimony showed that the nature, extent, and severity of her mental anguish had diminished.

Similarly, McCowan's initial emotional response to Taylor's death was understandably heightened. For several months, McCowan felt depressed and did not want to get out of bed. He suffered from loss of appetite and lost thirty pounds. McCowan testified that by the time of trial he was still unable to sleep more than two hours a night. But there was no evidence that McCowan had ever seen a doctor for any of his symptoms, or that he had ever been prescribed medication or participated in therapy, which are relevant considerations in evaluating the nature, extent, and severity of his mental anguish.

In sum, the evidence showed that Taylor's injuries and her death initially evoked intense emotional responses from Hatch and McCowan. Nevertheless, by three or four months after Taylor's death, both Hatch and McCowan were able to resume their day-to-day activities. Hatch and McCowan still had occasions, like the anniversary of Taylor's death, when they experienced heightened grief. But the intensity of their emotional responses and the effects of Taylor's death on their day-to-day lives had diminished over time. The evidence does not show that Taylor's death resulted in any long-term secondary illnesses for Hatch or McCowan, nor does it show that Taylor's death regularly interfered with their participation in daily activities. *See Hawkins*, 238 S.W.3d at 532 (concluding evidence was factually insufficient to support jury's award of $700,000 in past and future mental anguish damages to mother when there was insufficient evidence that adult daughter's death "resulted in a serious and permanent interference" with mother's daily activities); *see also Cuevas*, 561 S.W.3d at 577 (concluding evidence was factually insufficient to support $2.5 million past and future mental anguish damage award to father, even though his son's death caused him to develop high blood pressure and heart problems, which eventually led to the father's hospitalization and heart surgery).

With respect to mental anguish damages, "there must [] be some evidence to justify the amount awarded." *Saenz*, 925 S.W.2d at 614. "There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding." *Id*. Here, after considering and weighing all the evidence, we conclude awards of $10 million for each parent's past mental anguish and $5 million for each parent's future mental anguish are not justified by the evidence and are excessive. *See Cuevas*, 561 S.W.3d at 577 (concluding parents' awards of $2.5 million each for past mental anguish and $2.5 million each for future mental anguish were excessive); *see also Lawhorn*, 2019 WL 1288371, at *7 (affirming awards of $1 million each for past mental anguish and $250,000 each for future mental anguish to parents of adult son). We, therefore, sustain Jones's factual sufficiency complaint as to the past and future mental anguish damages awarded to Hatch and McCowan.

## C. Parents' Loss of Companionship and Society

The jury awarded Hatch and McCowan $1 million each in past loss of companionship and society and $5 million each in future loss of companionship and society. Jones challenges the legal and factual sufficiency of these awards.

Loss of companionship and society damages are intended to compensate loved ones for the positive benefits flowing from the love, comfort, companionship, and society that they would have received had the decedent lived. *Lillebo*, 722 S.W.2d at 687-88. Like mental anguish damages, loss of companionship and society damages are hard to quantify. *See Bentley*, 94 S.W.3d at 605. Factors relevant to loss of companionship and society damages include: (1) the relationship between a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) the parent and child's common interests and activities. *Lillebo*, 722 S.W.2d at 688.

Here, the jury charge defined "loss of companionship and society" as "the loss of positive benefits flowing from the love, comfort, companionship, and society [Hatch and McCowan], in reasonable probability, would have received from Taylor [] had she lived" and "will be sustained in the future." At trial, each parent testified about their relationship with Taylor. According to Hatch, she talked to Taylor on the phone about once a week, and Taylor came to visit her about once every two or three months. Additionally, Hatch sometimes went to San Antonio to visit Taylor and her twin sister. Hatch recalled that Taylor was the child who always hugged her, and she felt the loss of Taylor's love. Hatch emphasized that she missed Taylor every day. McCowan testified that he and Taylor had a very close relationship. They engaged in meaningful conversations about their lives and their faith. Taylor encouraged McCowan to change careers, which prompted him to apply to a college program for occupational therapy. Even though McCowan and Taylor lived in different cities, they talked on the phone every Sunday. McCowan further testified that he continued to miss these conversations.

Viewing the evidence in the light most favorable to the jury's findings, we conclude the evidence is legally sufficient evidence to support the award of some past and future loss of companionship and society damages to Hatch and McCowan. However, after considering and weighing all the evidence, we conclude the amounts awarded are not justified by the evidence and are excessive. At the time of her death, Taylor was living on her own. She had not lived in either parent's household for more than five years. Taylor and her parents lived in different cities and Taylor only visited them about once every two to three months. Hatch and McCowan communicated with Taylor by phone on a weekly rather than a daily basis. *See Lillebo*, 722 S.W.2d at 688 (recognizing living arrangements, absence for extended periods, and quality of relationship as relevant to loss of companionship and society damages). We conclude that awards of $1 million

in past loss of companionship and society damages, and $5 million in future loss of companionship and society damages to each parent are not justified by the evidence and are excessive. *See Cuevas*, 561 S.W.3d at 577 (concluding jury's awards of $5 million in past and future loss of companionship damages to each parent of adult child was excessive despite close relationships); *Lawhorn*, 2019 WL 1288371, at *6-7 (affirming awards of $200,000 in past loss of society or companionship and $500,000 in future loss of society or companionship to each parent, when parents and adult child had extremely close relationships, communicated almost daily by phone, vacationed together, and engaged in activities together). We, therefore, sustain Jones's factual sufficiency complaint as to the past and future loss of companionship and society damages awarded to Hatch and McCowan.

## D. Parents' Pecuniary Losses

The jury awarded Hatch and McCowan $300,000 each for their past pecuniary loss and $1 million each for their future pecuniary loss. Jones challenges the legal and factual sufficiency of the evidence to support these pecuniary loss awards.

In a wrongful death action, a beneficiary may recover damages for "pecuniary loss," that is, the present value of the benefits, including money and other benefits that could be valued in terms of money, that the beneficiary could reasonably expect to have received from the deceased had she survived. *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). For the parent of an adult child, "pecuniary loss" is defined as "the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the parents would, in reasonable probability, have received from their child had the child lived." *Lillebo*, 722 S.W.2d at 687; *see Uzoka*, 290 S.W.3d at 454. The law allows jurors to apply their knowledge and experience to estimate the value of household services an adult child rendered to

her parents, without direct proof of their value. *Excel Corp. v. McDonald*, 223 S.W.3d 506, 510 (Tex. App.—Amarillo 2006, pet. denied). "A jury's discretion in doing so is not unlimited, however, and must be based on the evidence adduced." *Id*.

The jury charge defined "pecuniary loss" as the "loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of pecuniary value that [Hatch and McCowan], in reasonable probability, would have received from Taylor [] had she lived," and the pecuniary loss that Hatch and McCowan, in reasonable probability, will sustain in the future.

The evidence shows that Hatch and McCowan never received direct financial support from Taylor, and they did not rely on her to perform ordinary household chores, repairs, or maintenance. Nevertheless, Hatch and McCowan contend the evidence is legally sufficient to support the jury's awards for their past and future pecuniary losses because Taylor provided them "care, maintenance, support, services, advice, and counsel."

Hatch points to evidence that Taylor expressed concern about Hatch's health and encouraged Hatch to go back to school. However, Taylor's expressions of concern and her encouragement are not benefits that can be valued in terms of money and, therefore, they are not pecuniary in nature. *See Lawhorn*, 2019 WL 1288371, at *8 (rejecting argument that $100,000 pecuniary loss award for each parent of adult son was justified because son supported parents emotionally and gave them advice). Hatch also points to evidence that when she was having back problems, Taylor came home from college, drove Hatch to her doctor's appointments, and took care of her. But there is no evidence that Hatch's back problems persisted after Taylor's death. Nor was there any evidence that Hatch ever needed to pay someone to take her to her doctor's appointments. *See McDonald*, 223 S.W.3d at 509 (noting evidence of son's routine household maintenance and repair, cleaning, and lawn mowing constituted evidence that mother "suffered

some pecuniary loss during the nearly one-year period from her son's death to the date of the verdict."). We conclude there is no evidence that Hatch suffered any pecuniary loss in the past, or that she will suffer any pecuniary loss in the future. *See Goodyear Tire & Rubber Co. v. Rogers*, 538 S.W.3d 637, 660 (Tex. App.—Dallas 2017, pet. denied) (concluding testimony about services husband might have provided in the form of painting, car repairs, and window replacement was too vague and speculative and was not legally sufficient evidence of $600,000 in actual pecuniary losses).

To support his contention that his past and present pecuniary loss awards are supported by legally sufficient evidence, McCowan points to evidence that Taylor encouraged him to return to school to become an occupational therapist, and that he relied on Taylor's life advice. But, again, encouragement and emotional support are not the types of benefits that can be valued in terms of money. *See Lawhorn*, 2019 WL 1288371, at *8 (holding son's advice and comfort did not support awards of $100,000 in pecuniary losses to his parents). Because the encouragement and emotional support Taylor provided McCowan was not pecuniary in nature, we conclude there is no evidence that McCowan suffered any pecuniary loss in the past, or that he will suffer any pecuniary loss in the future. *See id*.

Viewing the evidence in the light most favorable to the jury's findings, we conclude the evidence is legally insufficient to support any amount of pecuniary loss damages to Hatch and McCowan. We, therefore, sustain Jones's legal sufficiency complaint as to the pecuniary loss damages awarded.

### E. Taylor's Pain and Mental Anguish

The jury awarded Taylor's estate $24 million for Taylor's pain and mental anguish, which the jury charge defined as "the conscious physical pain and emotional pain, torment, and suffering

experienced by Taylor [] before her death as a result of the occurrence in question." On appeal, Jones argues the evidence is legally and factually insufficient to support the amount awarded.

In a survival action, the actionable wrong is the decedent's suffering before death, and the damages recoverable are those that the decedent sustained while alive. *Borth v. Charley's Concrete Co., Inc.*, 139 S.W.3d 391, 395 (Tex. App.—Fort Worth 2004, pet. denied). "Only pain and mental anguish that the deceased consciously experienced is compensable." *Cunningham v. Haroona*, 382 S.W.3d 492, 507 (Tex. App.—Fort Worth 2012, pet. denied); *see Evans*, 668 S.W.3d at 643. Damages for any pain or suffering during the time the injured person was unconscious are not permitted. *Casas*, 267 S.W.3d at 185. The existence of conscious pain may be established by circumstantial evidence. *Id*. at 186. Pain and suffering may be inferred as a consequence of severe injuries. *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.) "The duration of the pain and mental anguish is an important consideration." *Id*. "When the existence of some pain and mental anguish is established, the jury is given considerable discretion in determining the amount of fair and reasonable compensation for the decedent's pain and mental suffering." *Cunningham*, 382 S.W.3d at 507. However, that discretion has limits. *See Saenz*, 925 S.W.2d at 614. A jury may not pick a number out of the air. *See id*. The law requires appellate courts to conduct a meaningful review of pain and mental anguish damage awards to ensure that they are fair and reasonable. *See id*.; *Bentley*, 94 S.W.3d at 606.

With these principles in mind, we review the trial evidence regarding Taylor's consciousness. San Antonio Police Officer, Tyler Turner, who arrived at the accident scene before the paramedics, testified he saw Taylor inside her sedan and she was "unresponsive." Turner tried opening the doors, but they would not open. The windows were rolled up. Turner tried to get a response from Taylor by pounding on the windows and talking to her, but Taylor did not respond.

After firefighters removed Taylor from her sedan, paramedic Mikel Jennings assessed Taylor's level of consciousness. Jennings testified that Taylor did not respond to him verbally, but her eyes were partially open. Taylor's pupils were sluggish and reacted minimally to light. Jennings used the Glasgow Coma Scale (GCS) to assess Taylor's level of consciousness. The lowest score on the GCS—a three—means the patient has no response to any kind of pain or stimulus, and the highest score—a fifteen—means the patient is fully conscious and alert. Taylor's GCS score was very low—a five or six. However, Jennings and another paramedic on the scene believed that Taylor was responsive to pain because she responded to a "sternal rub," which involves "tak[ing] a knuckle" to the patient's sternum and "see[ing] if there's any response whatsoever." A sternal rub is "not gentle;" it is stimulation delivered to see if the patient will wake up. Jennings performed two sternal rubs on Taylor—once in the back of the ambulance and once at the hospital door. Taylor responded both times by wincing and making a moaning sound, but she did not otherwise respond. The paramedics' report, which was admitted into evidence, stated that Taylor was "[r]esponsive to [p]ain."

Hospital records stated that Taylor "remained GCS 3T since arrival." Testimony established that this phrase meant that Taylor was intubated and comatose.

Taylor's father, McCowan, testified that Taylor never moved her lips or responded to anything he said to her at the hospital.

Additionally, the evidence showed that Taylor's injuries were severe. Dr. Hannah Bielamowicz, a forensic pathologist, testified that Taylor's injuries consisted of bleeding over the surface of her brain (subdural hemorrhage); skin tears and lacerations on her forehead; a fractured nose; multiple fractures of her right femur; an open laceration on her right leg that exposed the bone; multiple fractures of her left leg; a fractured pelvis; lacerations of her liver and other internal

organs; a dislocated ankle; and numerous other lacerations, abrasions, and bruises covering her body.

Viewed in the light most favorable to the jury's finding, the evidence showed that Taylor was conscious and capable of feeling pain before she was admitted to the hospital. *See Casas*, 267 S.W.3d at 186 (recognizing conscious pain may be established by circumstantial evidence); *HCRA*, 178 S.W.3d at 871 (stating pain and suffering may be inferred from severe injuries). Accordingly, we conclude that there is legally sufficient evidence to support some amount of damages for Taylor's physical pain and mental anguish.

Next, we turn to Jones's complaint that the evidence is factually insufficient to support the $24 million awarded for Taylor's pain and mental anguish.

"Even though each case must be judged on its own unique facts, it is proper to consider other approved awards in similar cases to determine if an award for pain and suffering is excessive." *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 250 (Tex. App.—Texarkana 2005, no pet.).

Our analysis is guided by two similar cases. First, in *Guzman v. Guajardo*, parents brought a wrongful death and survival action after their seven-year-old son was struck by a truck and died. 761 S.W.2d 506, 512 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied). The child was "awake" and moaning immediately after the collision, and the child was screaming in pain in the emergency room. *Id*. Although the evidence did not show exactly how long the child suffered conscious physical pain before his death, it indicated it was for at least fifteen minutes. *Id*. Based on this evidence, the court of appeals concluded that the jury's award of $600,000 for the child's pain and mental anguish was not excessive. *Id*.

Second, in *Cuevas*, a jury awarded $10 million for the physical pain and mental anguish a burn victim endured before his death. 561 S.W.3d at 573. The victim was injured at work when an explosion knocked him off a platform and he was engulfed in flames. *Id*. The victim remained on fire until the fire burned itself out. *Id*. When a co-worker was finally able to reach the victim, he was still conscious. *Id*. Virtually every part of the victim's body was burned, and his clothing was burned into his skin. *Id*. When he arrived at the hospital, the victim was conscious, talking, and experiencing pain. *Id*. at 574. The doctors told the victim that they would have to amputate his arms and legs for him to have any chance to survive his injuries. *Id*. The victim survived for four days before dying. *Id*. A doctor testified that the victim was given pain medication at the hospital, but he did not know how well it worked in this situation. *Id*. at 573-74. Part of the victim's treatment was to give him large amounts of fluids, which caused his body to swell. *Id*. at 573. Because burned skin does not stretch, the doctors had to make incisions in the victim's arms, legs, and torso to allow the skin to expand. *Id*. The court of appeals held that the evidence was factually sufficient to support the jury's $10 million damage award for the victim's physical pain and mental anguish. *Id*. at 574.

In arguing that the amount of this award is excessive, Jones focuses on the limited duration of Taylor's consciousness. Most of the evidence showed that the collision occurred at 12:49 a.m. However, the paramedic's report stated that Taylor was injured at 12:40 a.m., and that the paramedics were dispatched at 12:50 a.m. The paramedic's report also stated that the ambulance arrived at the hospital at 1:29 a.m. The undisputed evidence showed that by the time Taylor was admitted to the hospital she was unconscious, and that she never regained consciousness.

There was also evidence that Taylor had caused her sedan to swerve, indicating that she anticipated the collision and tried to avoid it. The jury could have reasonably inferred that Taylor's

anticipation of the collision caused her mental anguish for which her estate was entitled to compensation. *See Missouri Pac. R. Co. v. Lane*, 720 S.W.2d 830, 833 (Tex. App.—Texarkana 1986, no writ) (concluding terror and mental anguish decedent suffered for the six to eight seconds before his pickup truck was struck by train was compensable). Based on Taylor's consciousness before and after the collision, the evidence shows that Taylor was conscious for less than an hour.

Unlike other situations in which juries have awarded substantial amounts for physical pain and mental anguish, Taylor was not consistently crying out in pain. Nor did she live with conscious pain for days or weeks. Here, one of the first officers to arrive at the scene described Taylor as unresponsive. He tried to awaken Taylor by calling out to her and pounding on the car window, but Taylor did not wake up. Later, while being transported to the hospital, Taylor reacted to two sternal rubs by wincing and making a moaning sound, but otherwise she was not crying out in pain. Although Taylor's injuries were severe, her conscious physical pain and mental anguish lasted for less than an hour. After considering and weighing all the evidence, we conclude that a $24 million damage award for Taylor's conscious physical pain and mental anguish is not justified by the evidence and is excessive. *See Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 230 (Tex. App.—Amarillo 2003, no pet.) (concluding evidence did not support jury's $4.5 million physical pain and mental anguish damage award for patient with broken leg who suffered pain and mental anguish over a sixteen-day period and suggesting a remittitur to $1 million); *see also Cuevas*, 561 S.W.3d at 573-74 (concluding $10 million for burn victim's physical pain and mental anguish was not excessive when he was conscious, talking, and experiencing pain when he arrived at the hospital; doctor expressed uncertainty about the effectiveness of pain medication; and he survived for four days). We, therefore, sustain Jones's factual sufficiency complaint as to the pain and mental anguish damages awarded to Taylor's estate.

**EXEMPLARY DAMAGES**

Jones argues that the jury's $13.12 million award of exemplary damages to Taylor's estate should be reversed because: (1) exemplary damages were capped at $750,000.00 based on Hatch and McCowan's pleadings; (2) the evidence is legally and factually insufficient to support the jury's intoxication finding; and (3) the evidence is legally and factually insufficient to support the jury's finding on the subjective element of gross negligence.

Exemplary damages are damages awarded as a penalty or by way of punishment but not for compensatory purposes. TEX. CIV. PRAC. & REM. CODE § 41.001(5). Exemplary damages may be awarded only if damages other than nominal damages are awarded. *Id*. 41.004(a).

**A. Allegations of Conduct Described as a Felony**

Jones argues the jury's $13.12 million exemplary damages award should have been capped at $750,000.00 because Hatch and McCowan failed to allege conduct described as a felony in their pleadings. Jones made this objection in the trial court, and the trial court overruled his objection.

Generally, exemplary damages are capped under the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b). However, exceptions exist for certain conduct described as a felony. *See id*. 41.008(c). "A plaintiff can avoid [this] cap by pleading and proving the defendant intentionally or knowingly engaged in felonious conduct under criminal statutes expressly excluded from the cap under section 41.008(c)." *Zorrilla*, 469 S.W.3d at 157. "Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000)

Although Hatch and McCowan's live pleading did not cite section 41.008(c) of the Texas Civil Practice and Remedies Code, it did allege that Jones had engaged in conduct described as a

felony. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(c)(15) (stating exemplary damages cap does not apply to a cause of action seeking recovery of exemplary damages based on intoxication manslaughter). Specifically, Hatch and McCowan's pleadings alleged: "Defendant Jones, while intoxicated by more than twice the legal alcohol limit[] of this State, drove the wrong way up an exit ramp on N. Loop 1604 and violently collided head-on with [Taylor's] vehicle. . . . Taylor . . . suffered extensive excruciating, conscious pain and suffering ultimately leading to death after two weeks in a coma." We conclude McCowan's pleadings adequately alleged conduct described as a felony and, therefore, the trial court did not abuse its discretion by overruling Jones's objection. *See Badall v. Durgapersad*, 454 S.W.3d 626, 636-37 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding that plaintiff's pleadings sufficiently pled Survival Act claim even though relevant statute was not cited).

**B. Intoxication Finding**

The jury found that Jones operated a motor vehicle in a public place while intoxicated and by reason of that intoxication caused Taylor's death by accident or mistake.[3] On appeal, Jones argues this finding is not supported by legally or factually sufficient evidence because the evidence fails to show that Jones was intoxicated "at the time he operated a motor vehicle and was in an accident with Taylor." Jones further argues his blood alcohol level was not established by scientific evidence.[4]

Contrary to Jones's argument, there is no requirement that intoxication be established by scientific evidence. In fact, Texas law provides that intoxication may be proven through

---

[3]The jury charge defined "intoxication" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol or having an alcohol concentration of 0.08 percent or more."

[4]Additionally, Jones emphasizes that he was convicted of manslaughter and acquitted of intoxication manslaughter in the related criminal case.

circumstantial evidence. *Smithhart v. State*, 503 S.W.2d 283, 285 (Tex. Crim. App. 1973); *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("Circumstantial evidence may prove that a person has lost the normal use of his mental or physical faculties by reason of introduction of [alcohol] . . . into his body."). Furthermore, the testimony of a police officer regarding a defendant's behavior and the officer's opinion that the defendant was intoxicated provides sufficient support for a conviction. *Zill v. State*, 355 S.W.3d 778, 785–86 (Tex. App—Houston [1st Dist.] 2011, no pet.).

In this case, there was some evidence showing that Jones was intoxicated when he struck Taylor's sedan. One of the first police officers on the scene, Turner, testified that the collision occurred because Jones drove the wrong way up a freeway off-ramp, and that this is a mistake frequently made by intoxicated drivers. Next, Maria Salazar, the officer who investigated the crash, testified that Jones's blood alcohol level was tested after the collision and the results showed his blood alcohol level was 0.17, which is more than twice the legal limit. Excerpts from Jones's testimony during his criminal trial were admitted into evidence. In these excerpts, Jones testified that the evening before the collision he drank two beers at home and two shots of alcohol at a bar. Finally, excerpts from Jones's deposition testimony were admitted at trial. In his deposition, Jones repeatedly invoked his Fifth Amendment right against self-incrimination. Jones was asked if he attended multiple bars on the night of the collision, if he gave a blood or breath test immediately after the collision, and if he had a blood alcohol level of 0.17. In a civil case, a jury may draw negative inferences from a party's assertion of the privilege against self-incrimination. *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2002); *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995). Based on Jones's answers invoking his Fifth Amendment right

against self-incrimination, the jury was entitled to infer that Jones was intoxicated. *See Wilz*, 228 S.W.3d at 677; *Denton*, 897 S.W.2d at 760.

After reviewing the evidence under the proper standards of review, we hold the evidence is legally and factually sufficient to support the jury's finding that Jones was intoxicated when he collided with Taylor's sedan.[5]

## C. Gross Negligence Finding

To support an award of exemplary damages, a plaintiff must prove, by clear and convincing evidence, that the complained-of conduct resulted from fraud, malice, or gross negligence. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a). In the present case, Hatch and McCowan relied on gross negligence to support their claim for exemplary damages.

Gross negligence consists of both objective and subjective components. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). "Plaintiffs must prove by clear and convincing evidence that (1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others." *Id*. Objectively, the defendant's conduct must create "an extreme degree of risk." *Universal Servs. Co., Inc. v. Ung*, 904 S.W.2d 638, 641 (Tex. 1995). Subjectively, the defendant must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *Id*.

---

[5]To the extent Jones asserts some of the evidence of Jones's intoxication was not properly authenticated, we conclude his complaint is waived by his failure to object to the admission of the evidence at trial and obtain a ruling from the trial court. *See* TEX. R. APP. P. 33.1(a).

In reviewing the legal sufficiency of the evidence supporting a finding that must be proven by clear and convincing evidence, we must consider "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005). In conducting a factual sufficiency review under a clear and convincing standard, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Galvan v. Vera*, No. 04-18-00309-CV, 2018 WL 4096383, at *3 (Tex. App.—San Antonio Aug. 29, 2018, no pet.) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). The evidence is only factually insufficient if the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id*.

Here, Jones argues the evidence is legally and factually insufficient to support the jury's gross negligence finding because the evidence did not show that he had subjective awareness that he was driving the wrong way on the exit ramp, and that he knowingly did so with conscious indifference to the safety of others. This argument misses the mark. The jury was not required to find that Jones had subjective awareness that he was driving the wrong way on the exit ramp. The jury was required to find that Jones had actual, subjective awareness of *the risks involved in driving while intoxicated*, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Based on the evidence presented, the jury could have properly determined Jones had actual subjective awareness of the risks an intoxicated driver poses to the rights, safety, or welfare of others.

The evidence showed that law enforcement officers are trained about the dangers of driving while intoxicated and that Jones was a law enforcement officer—a deputy U.S. marshal.

Additionally, the evidence supported the conclusion that on the night of the collision, Jones knowingly consumed alcohol and chose to drive while intoxicated. In testimony from his criminal trial, Jones admitted that hours before the collision he consumed two beers at home and two shots at a bar. Furthermore, during his deposition, Jones was asked if he went to multiple bars on the night of the collision and if he had a blood alcohol level of .17 on the night of the collision. In response to these questions, Jones asserted his Fifth Amendment privilege against self-incrimination. Based on Jones's answers invoking his Fifth Amendment right against self-incrimination, the jury was entitled to infer that Jones visited multiple bars, consumed alcohol, and became intoxicated on the night of the collision. *See Wilz*, 228 S.W.3d at 677; *Denton*, 897 S.W.2d at 760.

Viewing the evidence under the proper standards of review, we conclude a reasonable juror could have formed a firm belief or conviction that Jones was subjectively aware of the risks of driving while intoxicated, but nevertheless acted with conscious indifference to the rights, safety, or welfare of others. *See Rayner v. Dillon*, 501 S.W.3d 143, 157 (Tex. App.—Texarkana 2016, pet. dism'd by agr.) (holding evidence was sufficient for jury to form a firm belief or conviction that trucking company was grossly negligent when it knew of risks associated with over-hour violations and continued to permit employee to violate these limits in conscious disregard of the safety of others).

We overrule Jones's complaints challenging the exemplary damages.

### CHARGE ERROR

Jones presents five complaints about the jury charge. Only two of his complaints were properly preserved for our review.

To preserve error for appellate review, a party is generally required to make a timely objection in the trial court and obtain a ruling. TEX. R. APP. P. 33.1(a). The Texas Rules of Civil Procedure provide: "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." TEX. R. CIV. P. 274. There is one basic test for preserving error in the jury charge—whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. *Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012) (citing *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)).

The trial court has considerable discretion to determine proper jury instructions. *Id*. at 687. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and the evidence. *Id*. We review a trial court's decision to submit or refuse a particular instruction for an abuse of discretion. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).

## A. Preserved Complaints

Both of Jones's preserved complaints relate to Question 2 of the jury charge, which stated:

Did Jonathan P. Jones operate a motor vehicle in a public place while intoxicated and by reason of that intoxication cause the death of Taylor McCowan by accident or mistake?

"INTOXICATED" means not having the normal use of mental or physical faculties by reason of the introduction of alcohol or having an alcohol concentration of 0.08 percent or more.

The jury answered "Yes" to this question. The charge further instructed that the burden of proof for this question was a preponderance of the evidence.

At the charge conference, Jones characterized Question 2 as "a question for removing the limitation on exemplary damages," and he objected to it because "the cap-buster language was required to be pled, and it was never pled in this case." In response, Hatch and McCowan's counsel asserted that their petition included the proper factual allegations "so it's nothing new to counsel

about the intoxication on the night of [the collision and] driving up the wrong way or anything like that." The trial court then reviewed the pleadings and concluded that even though Hatch and McCowan's pleadings did not cite section 41.008 of the Texas Civil Practice and Remedies Code, they did provide fair notice of felony conduct that would lift the statutory cap.[6] As we previously determined, Hatch and McCowan's pleadings provided fair notice of felony conduct. We conclude the trial court did not abuse its discretion by overruling Jones's objection that Question 2 was not properly supported by the pleadings.

Jones also objected at the charge conference that the burden of proof for the alleged felony conduct was not a preponderance of the evidence, but beyond a reasonable doubt. Jones cites a single case to support this complaint, *Mission Res., Inc. v. Garza Energy Tr.*, 166 S.W.3d 301, 315 (Tex. App.—Corpus Christi-Edinburg 2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008). In that case, the court of appeals was not asked to decide the burden of proof under section 41.008(c). *Id.* The opinion merely states, without analysis or discussion, that the plaintiffs were required to prove the felony conduct beyond a reasonable doubt, which is the usual standard of proof in criminal cases. *Id*. Because the cited language is dicta, we decline to follow it.

Section 41.008(c) of the Texas Civil Practice and Remedies Code is a civil statute, and it does not state the burden of proof applicable to proving "conduct described as a felony." *See* TEX. CIV. PRAC. & REM. CODE § 41.008(c). The underlying case is a civil case. The general rule in civil cases is that the burden of proof is a preponderance of the evidence. *Carter v. Harris Cnty. Appraisal Dist.*, 409 S.W.3d 26, 36 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Flores v. Cuellar*, 269 S.W.3d 657, 660 (Tex. App.—San Antonio 2008, no pet.). We conclude the trial

---

[6]Section 41.008(c) provides that the cap on the recovery of exemplary damages "does not apply to a cause of action against a defendant from whom a plaintiff seeks recovery of exemplary damages based on conduct described as a felony in" certain enumerated sections of the Texas Penal Code. TEX. CIV. PRAC. & REM. CODE § 41.008(c).

court did not abuse its discretion by overruling Jones's objection to the burden of proof for Question 2.

## B. Unpreserved Complaints

"Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006). In a civil case, fundamental error occurs when: (1) the record affirmatively and conclusively shows that the court rendering judgment lacked subject matter jurisdiction; or (2) the error directly and adversely affects the public generally. *Id.*; *Guzzetta v. Brimhall, LLC*, 678 S.W.3d 251, 256-57 (Tex. App.—San Antonio 2013, no pet.).

In his remaining charge complaints, Jones argues that Instruction 1 and Question 1 constituted improper comments on the weight of the evidence. Instruction 1 stated that voluntary intoxication did not constitute a defense to the commission of a crime under the Texas Penal Code. Question 1 asked if Jones's negligence proximately caused the incident that formed the basis of the lawsuit.

Jones also argues that Question 3 omitted a material instruction that the jury may consider the relationship between the parent and the child, their living arrangements, any extended absences, the harmony of their family relations, and their common interests and activities. Question 3 asked what sum of money would fairly and reasonably compensate Hatch and McCowan for their damages, if any, resulting from Taylor's death.

Jones argues that all three of these unpreserved complaints constitute fundamental error because they "deprived him of a fair trial—a due process complaint in which the public has an interest." We disagree. Jones's unpreserved jury charge complaints implicate his own interests, not the public's. *See Guzzetta*, 678 S.W.3d at 257 (holding no fundamental error present when the

issues in the case affected only the rights of particular litigants and did not affect the public generally).

We conclude that Jones's remaining charge complaints were subject to the rules of error preservation. *See Thota*, 366 S.W.3d at 689 (stating that to preserve charge error complaining party must make the trial court aware of his complaint, timely and plainly, and obtain a ruling). Accordingly, Jones's unpreserved jury charge complaints present nothing for our review. *See* TEX. R. APP. P. 33.1(a).

## CONCLUSION

We have determined that Hatch and McCowan's pecuniary loss damages are supported by legally insufficient evidence, and that Hatch and McCowan's mental anguish and loss of companionship and society damages, and Taylor's pain and mental anguish damages are excessive. Additionally, we have overruled Jones's complaints about the exemplary damages.

Ordinarily, damage awards based on factually insufficient evidence result in reversal and remand for a new trial. However, both sides urge us to suggest a remittitur in this case.[7] *See* TEX. R. APP. P. 46.3 (authorizing suggestion of remittitur by court of appeals); *Cuevas*, 561 S.W.3d at 561 ("A court of appeals may exercise its authority to suggest a remittitur when there is insufficient evidence to support the full amount of damages awarded but sufficient evidence to support a lesser award."). In setting remittitur amounts, we are permitted to consider other appellate cases. *Cuevas*, 561 S.W.3d at 577. The amounts we suggest are based on our review of the evidence in the present case as well as other appellate cases. *See id*. We suggest a remittitur to the following amounts:

---

[7]In their brief, Hatch and McCowan strongly urge us to suggest a remittitur instead of an outright remand for new trial.

Hatch's mental anguish in the past: $5 million

Hatch's mental anguish in the future: $2.5 million

McCowan's mental anguish in the past: $5 million

McCowan's mental anguish in the future: $2.5 million

Hatch's loss of companionship and society in the past: $500,000.00

Hatch's loss of companionship and society in the future: $1.5 million

McCowan's loss of companionship and society in the past: $500,000.00

McCowan's loss of companionship and society in the future: $1.5 million

Taylor's pain and mental anguish: $6 million

*See id*. (suggesting remittitur of parents' combined mental anguish and loss of companionship damages from $20 million to $7 million); *Cresthaven*, 134 S.W.3d at 230 (suggesting remittitur of physical pain and mental anguish damages from $4.5 million to $1 million for nursing home patient with broken leg who suffered physical pain and mental anguish over a sixteen-day period).

If Hatch and McCowan, individually and as representatives of Taylor's estate, file a remittitur as detailed in our judgment with the clerk of this court within twenty days from the date of this opinion, we will modify the trial court's judgment accordingly and affirm the judgment as modified. If the remittitur is not timely filed, we will reverse the trial court's judgment and remand this case for a new trial. *See* TEX. R. APP. P. 46.3. Because liability was contested in the trial court, we will be required to remand for a new trial on liability along with all actual and exemplary damages, except, of course, pecuniary loss damages. *See* TEX. R. APP. P. 44.1(b) (providing court of appeals "may not order a separate trial solely on unliquidated damages if liability is contested."); *Bentley*, 94 S.W.3d at 607 (noting exemplary damages must be reassessed when actual damages are reversed and remanded for new trial); TEX. CIV. PRAC. & REM. CODE § 41.004(a) (providing

that exemplary damages may be awarded only if damages other than nominal damages are awarded).

Adrian A. Spears II, Justice